1

United States District Court
Southern District of Texas
FILED

AUG 1 0 2000

Michael N. Milby
Clerk of Court

# UNITED STATES DISTRICT COURT
## Southern District of Texas
### At Brownsville

Case No. **B - 00 - 31**

~~MISCELLANEOUS~~

**B-00-129**

REYANALDO COBIO CERVANTES,
Petitioner,
vs.
WAYNE SCOTT,
Executive Director of the Texas State Department of Criminal Justice
Respondent.

---

## APPLICATION FOR RELIEF FROM STATE CONVICTION

---

## TO THE HONORABLE PRESIDING
## UNITED STATES DISTRICT JUDGE

---

## PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. 2254

---

William Edward May, Jr.
Attorney at Law
Texas State Bar No. 13271600
6000 S. Staples, Suite 404
Corpus Christi, TX 78413
Phone: (361) 994-0322
Fax: (361) 994-9285

# PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

1.　　Name and location of court which entered the judgment of conviction under attack - 138th Judicial District Court of Cameron County, Cameron County Courthouse, Brownsville, Texas 78520.

2.　　Date of judgment of conviction December 16, 1992.

3.　　Length of sentence is - incarceration for life in the Texas Department of Criminal Justice, Institutional Division.

4.　　Nature of offense involved (all counts) - Count One, Capital Murder; and County Two, Murder.

5.　　What was your plea? (Check one)
　　(a)　　Not guilty ___X___.
　　(b)　　Guilty _____.
　　(c)　　Nolo contendere _____.
If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details: _____

6.　　Kind of trial: (Check one)
(a) Jury ___X___.
(b) Judge only _____.

7. Did you testify at the trial?
Yes _____ No ____X_____

8.　Did you appeal from the judgment of conviction?

Yes ____X____ No _____

9.　　If you did appeal, answer the following:
　　(a)　　Name of court - 13th Court of Appeals at Corpus Christi, Texas.
　　(b)　　Result - Affirmed.
　　(c)　　Date of result - July 21, 1994.

10.　Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes ____X____ No_____

11. If your answer to 10 was "yes," give the following information:

(a)        (1)   Name of court - Texas Court of Criminal Appeals, Austin, Texas.

           (2)   Nature of proceeding - State Habeas Corpus.

           (3)   Grounds raised - Ineffective Assistance of Counsel.

           (4)   Did you receive an evidentiary hearing on your petition, application or motion?
Yes _____ No _____X_____

           (5)   Result - Given Leave to File Out-of-Time Petition for Discretionary Review.

           (6)   Date of result May 20, 1998.

(b)  As to any second petition, application or motion give the same information:
       (1)    Name of court - Texas Court of Criminal Appeals, Austin, Texas

       (2)    Nature of proceeding - Petition for Discretionary Review

       (3)    Grounds raised - Ineffective Assistance of Counsel and Denial of Due Process

       (4)    Did you receive an evidentiary hearing on your petition, application or motion?
Yes _____ No _____X_____

       (5)    Result - Relief Denied.

       (6)    Date of result - November 18, 1998

(c)  As to any third petition, application or motion, give the same information: N/A
       (1)    Name of court _____
       (2)    Nature of proceeding _____
       (3)    Grounds raised _____
       (4)    Did you receive an evidentiary hearing on your petition, application or motion?
      Yes_____ No _____
       (5)    Result _____
       (6)    Date of result _____.

(d)    Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

(1) First petition, etc.     Yes ___X___ No _____
(2) Second petition, etc.   Yes ___X___ No _____
(3) Third petition, etc.     Yes _____ No _____

(e)    If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not: Had no right to appeal further.

12. State concisely every ground on which you claim that you are being held unlawfully.  Summarize briefly the facts supporting each ground.  If necessary, you may attach pages stating additional grounds and facts supporting same.

Please refer to the attached Memorandum of Law in Support of Application.

(a) Conviction obtained by the unconstitutional failure of the prosecution to disclose its bargains with a State's witness, to wit: exculpatory evidence favorable to the defendant.

(b) Denial of effective assistance of trial counsel.

(c) Actual innocence, to wit: failure to be convicted on proof beyond a reasonable doubt.

(d) Subornation of perjured testimony by the State.

13.    If any of the grounds listed in 12a, b, c, and d were not previously presented in any other court, state or federal, state briefly what grounds were not so presented, and give your reasons for not presenting them: _____N/A_____.

14.    Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes _____ No ___X___

15.    Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
(a)    At preliminary hearing _____N/A_____
(b)    At arraignment and plea ____N/A_____
(c)    At trial - Richard Hoffman, 1718 Boca Chica, Brownsville, TX 78520
(d)    At sentencing - Richard Hoffman, 1718 Boca Chica, Brownsville, TX 78520

(e)　　On appeal - John Olson, 1718 Boca Chica, Brownsville, TX 78520

(f)　　In any post-conviction proceeding - Joseph A. Connors, III, PO Box 5838, McAllen, TX 78502-5838

(g)　　On appeal from any adverse ruling in a post-conviction proceeding - _____N/A_____.

16.　　Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?

　　　　　　Yes _____ No ____X_____

17.　　Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

　　　　　　Yes _____ No ___X___

(a)　　If so, give name and location of court which imposed sentence to be served in the future: N/A

(b)　　And give date and length of sentence to be served in the future:

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?  N/A

Yes _____ No _____

　　　　Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney

William Edward May, Jr.
Attorney at Law
Texas State Bar No. 13271600
6000 S. Staples, Suite 404
Corpus Christi, TX 78413
Phone: (361) 994-0322
Fax: (361) 994-9285

# UNITED STATES DISTRICT COURT
## Southern District of Texas
### At Brownsville

Case No. _____

# REYANALDO COBIO CERVANTES,
Petitioner,

vs.

# WAYNE SCOTT,
Executive Director of the Texas State Department of Criminal Justice
Respondent.

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATION

## TO THE HONORABLE PRESIDING
## UNITED STATES DISTRICT JUDGE

## PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. 2254

William Edward May, Jr.
Attorney at Law
Texas State Bar No. 13271600
6000 S. Staples, Suite 404
Corpus Christi, TX 78413
Phone: (361) 994-0322
Fax: (361) 994-9285

## STATEMENT OF JURISDICTION

The District Court of the Southern District of Texas has the power to grant the

relief prayed for in this Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C.

2254 that grants to the United States District Courts jurisdiction to grant relief to

prisoners incarcerated pursuant to state judgments when and if an Applicant is being

held in custody in violation of the Constitution or laws or treaties of the United

States.  The United States Code, 28 U.S.C. 2241(d), sets venue in the Southern

District of Texas at Brownsville; the Applicant was convicted in Cameron County,

State of Texas.

# STATEMENT OF THE ISSUES:

ISSUE NO. 1:   WHETHER REYANALDO COBIO CERVANTES WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL DURING HIS TRIAL AND APPEAL.

ISSUE NO. 2:   WHETHER APPLICANT WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL WHEN THE STATE URGED INVESTIGATOR, ABEL PEREZ, TO KNOWINGLY TAKE A FALSE STATEMENT FROM EDDIE FARIAS, AND, THEREAFTER, TO KNOWINGLY USE THAT PERJURED TESTIMONY.

ISSUE NO. 3:  WHETHER, BASED ON THE EVIDENCE ADDUCED AT TRIAL, EXCLUDING THE AFORESAID PERJURED TESTIMONY, NO RATIONAL TRIER OF FACT COULD HAVE FOUND PROOF OF GUILT BEYOND A REASONABLE DOUBT.

ISSUE NO. 4:  WHETHER THE STATE FAILED TO COMPLY WITH ITS DUTIES UNDER *GIGLIO V. U.S.*, 405 U.S. 150, 92 S.CT. 763, 31 L.ED.2D 104 (1972) BY WITHHOLDING EVIDENCE REGARDING ITS PROMISE OF LENIENCY TO A KEY STATE'S WITNESS.

# STATEMENT OF THE CASE

## CONFINEMENT AND RESTRAINT

Applicant, REYANLDO COBIO CERVANTES, Texas Inmate No. 632644, is

unlawfully confined and restrained of his liberty by WAYNE SCOTT, acting in his

official capacity as Executive Director of the Texas State Department of Criminal

Justice, Institutional Division, at the Ferguson Unit, in Midway, Texas, pursuant to

an illegal Judgment of conviction entered on December 16, 1992, from the 138th

District Court, of Cameron County, Texas, in Cause No. 92-CR-933-B, for the

offense of murder. The judgment of conviction and sentence are illegal in that they

were obtained in violation of the constitution, or laws, or treaties of the United

States.

Punishment was assessed at a life of confinement in the Texas Department of

Criminal Justice, Institutional Division. Copies of the Judgment and sentence are

available to this Court as an exhibit; and, they are to be found in their original

condition in the Office of the 138th District Court Clerk of Cameron County,

Cameron County Courthouse, Brownsville, Texas, 78520; said District Clerk

possesses the official 138th District of Texas court file. An appeal was given and

taken to the Court of Appeals, of the Thirteenth District of Texas, at Corpus Christi,

Texas. The Court of Appeals affirmed on July 21, 1994, in an opinion filed in

appellate cause number 13-93-136-CR; and, it is attached as an exhibit.

Initially, the Applicant filed no petition for discretionary review with the Court

of Criminal Appeals. However, after the time had expired, Applicant filed an

application for a writ of habeas corpus, to wit: cause number 73,085, alleging, among

other things, ineffective assistance of trial counsel for failing to advise him of the

time limitation for filing a petition for discretionary review.  On May 20, 1998, the

Court of Criminal Appeals granted relief, stayed the court of appeals mandate, and

remanded to the 13th Court of Appeals - - allowing the Applicant to file an out-of-

time petition for discretionary review. On September 2, 1998, the Applicant filed his

out-of-time petition for discretionary review, to wit: cause number 1420-98.  On

November 18, 1998, the Court of Criminal Appeals denied relief, its ruling became

final on December 18, 1998, and the mandate from the 13th Court of Appeals was

reissued on January 4, 1999, at which time the Applicant exhausted all of his state

remedies.

## STATEMENT OF FACTS

In the trial court, on August 12, 1992, the 138th District Clerk of Cameron County, Texas, filed a grand jury indictment charging applicant with capital murder in count one and murder in count two in cause no. 92-CR-933-B.  Count one in the indictment alleged that applicant, on or about the 14th day of March, 1992, in the County of Cameron, State of Texas, did then and there unlawfully, while in the course of committing and attempting to commit the offense of ROBBERY of MOISES HUERTA, III, intentionally cause the death of MOISES HUERTA, III with a tire tool.  Count two of the indictment alleged that applicant on or about the 14th day of March, 1992, in the County of Cameron, State of Texas, did then and there unlawfully, with the intent to cause serious bodily injury to MOISES HUERTA, III, commit an act clearly dangerous to human life that caused the death of MOISES HUERTA, III, said act being: striking MOISES RUERTA, III with a tire tool, that in the manner of its use and intended use was capable of causing serious bodily injury or death, against the peace and dignity of the State.

On November 18, 1992, a jury rejected the Applicant's plea of not guilty and found him guilty of the offense of felony murder as charged in count two of the indictment. On December 16, 1992, the district court pronounced sentence at confinement for life in the Texas Department of Criminal Justice, Institutional Division.

An original [or a copy] of each of the following documents is attached hereto and incorporated herein for the convenience of this Court:

Exhibit A,
the district court's judgment and sentence in cause no. 92-CR-933-B;

Exhibit B,
the grand jury's indictment in cause no. 92CR-933-B;

Exhibit C,
the Court's Charge to jury in cause no. 92-CR933-B;

Exhibit D,
the Court of Appeals' judgment and opinion in cause no. 13-93-136-CR;

Exhibit E,
the affidavit of Margarito Morin;

Exhibit F,
the court reporter's partial statement of facts - - of Eddie Farias's testimony during the State's direct examination (CR 270-284); and

Exhibit G,
defense counsel's trial motion - - for State to reveal any agreements.

## SUMMARY OF THE ARGUMENT

ISSUE NO. 1:   WHETHER REYANALDO COBIO CERVANTES WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL DURING HIS TRIAL AND APPEAL.

Applicant was deprived of his Sixth Amendment right to the effective assistance of counsel during his trial and appeal. Applicant's trial and appellate counsel were constitutionally deficient in their pretrial and trial investigation of the case, in the presentation of the trial evidence, in the failure to request an accomplice-witness instruction, in the handling of the direct appeal, in a failure to fully investigate, develop, or present impeachment evidence during the guilt and punishment phases of the trial, and in failing to file a timely petition for discretionary review.

ISSUE NO. 2:   WHETHER APPLICANT WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL WHEN THE STATE URGED INVESTIGATOR, ABEL PEREZ, TO KNOWINGLY TAKE A FALSE STATEMENT FROM EDDIE FARIAS AND, THEREAFTER, TO KNOWINGLY USE SAID PERJURED TESTIMONY.

The Applicant was denied due process of law when a State investigator pressured an eyewitness to give a false statement implicating the Applicant and by the prosecutor(s) knowingly using said statement.

ISSUE NO. 3:  WHETHER, BASED ON THE EVIDENCE ADDUCED AT TRIAL, AFTER EXCLUDING THE PERJURED TESTIMONY OF EDDIE FARIAS, NO RATIONAL TRIER OF FACT COULD HAVE FOUND PROOF OF GUILT BEYOND A REASONABLE DOUBT.

Ignoring the perjured testimony of Eddie Farias, and thereafter reviewing the remaining evidence in light of the accomplice-witness jury instruction, that should

CVAPDF - www.fawiss.com

have been given, this Honorable Court should find no evidence from which a rational trier of fact could have found proof of the Applicant's guilt beyond a reasonable doubt.

In the instant case, viewing the evidence after excluding the perjured testimony of Eddie Farias as is required by Texas law on the issue of accomplice-witnesses, this Honorable Court should find insufficient proof of guilt beyond a reasonable doubt.

ISSUE NO. 4:  WHETHER THE STATE FAILED TO COMPLY WITH ITS DUTIES UNDER *GIGLIO V. U.S.*, 405 U.S. 150, 92 S.CT. 763, 31 L.ED.2D 104 (1972) BY WITHHOLDING EVIDENCE REGARDING ITS PROMISE OF LENIENCY TO A KEY STATE WITNESS.

The failure of the State to comply with its duties to disclose "deals" that it had with its key witness, Eddie Farias, deprived the Applicant a fair trial.

## ARGUMENT AND AUTHORITIES

## STANDARD OF REVIEW:

The Fifth Circuit Court of Appeals recently stated the burden that must be established by the petitioner in order to be entitled to federal habeas corpus relief. See: *Moore v. Johnson*, 194 F.3d 586 (C.A. 5, 1999).

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant can make both showings it cannot be said that the conviction...resulted from a breakdown in the adversary process that renders the result unreliable. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2064 (1984).

"Judicial scrutiny of counsel's performance must be highly deferential. *Id.* at 2065. We therefore indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance. *Id.* at 2065-66. Such decisions are 'virtually unchallengeable' and cannot be made the basis of relief on a Sixth Amendment claim absent a showing that the decision was unreasonable as a matter of law. See *Id.* at 2066; *Loyd v. Whitley*, 977 F.2d 149, 157 (5th Cir. 1992); *Wilson v. Butler*, 813 F.2d 664, 672 (5th Cir. 1987). Strategic choices made after less than complete

investigation are reasonable only to the extent that reasonable professional

judgments support the limitations on investigation. *Strickland*, 104 S.Ct. at 2066;

*Whitley*, 977 F.2d at 157-58."

However, summary dismissal of a petition for federal habeas corpus relief shall

not be appropriate unless the petition is patently frivolous or false, See:

*Pennsylvania ex Rel. Herman v. Claudy*, 350 U.S. 116 (1956); vague, or palpably

incredible, See: *Machibroda v. United State*, 368 U.S. 487 (1962).

ARGUMENTS:

ISSUE NUMBER ONE RESTATED:

ISSUE NO. 1:   WHETHER REYANALDO COBIO CERVANTES WAS DEPRIVED OF HIS
SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL DURING HIS
TRIAL AND APPEAL.

Judged by the familiar *Strickland* standard, the Applicant was denied his Sixth

Amendment right to the effective assistance of counsel, and he is therefore entitled to

a hearing on the issue.

Whether or not an Applicant has been denied the effective assistance of

counsel is to be judged by the familiar standard set forth in *Strickland v.*

*Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ; and adopted by

the State of Texas in *Hernandez v. State*,  988 S.W.2d 770, (Tex.Crim.App., 1999).

Nevertheless, in *Moore v. Johnson*,  194 F.3d 586 (C.A. 5, 1999), the Fifth

Circuit Court of Appeals found:

"...counsel's decision not to present any mitigating evidence was not motivated

or justified by any strategic or tactical rationale. See *Whitley*, 977 F.2d at 158-59 &

at 21-22; *Profitt*, 831 F.2d at 1249; *Lyons*, 770 F.2d at 534-35 (*Strickland* does not

require deference when there is no conceivable strategic purpose that would explain

counsel's conduct)."

In *Cuyler v. Sullivan*, 446 U.S. 335 (1980), the Court also stated:

"...we see no basis for drawing a...distinction between retained and appointed

counsel that would deny equal justice to defendants who must choose their own lawyers."

In the instant case, trial counsel was ineffective in one or more of the following ways:

a.  Trial counsel failed to request the trial court: 1) to include an accomplice-witness instruction; and. 2) trial counsel failed to object to the trial court's failure to include an accomplice-witness jury instruction, regarding Eddie Farias, in the court's instructions to the jury. [Note: Applicant's guilt or innocence would be determined almost solely on the basis of this accomplice-witness testimony.] The failure of counsel to request a charge on accomplice-witness testimony, and counsel's failure to object to the lack of such a charge, rendered Applicant's trial counsel ineffective.

b.  Trial counsel failed to investigate the matter of the State's "deal(s)" and subornation of perjury with the witness, Eddie Farias, and to do what was necessary to prove to the fact finders that the witness's trial testimony would be false, and to determine that said false testimony had been knowingly induced, knowingly obtained, and/or knowingly used by the State.

The petitioner was denied effective counsel and deserves habeas corpus relief.

## ISSUE NUMBER TWO RESTATED:

ISSUE NO. 2:   WHETHER APPLICANT WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL WHEN THE STATE URGED INVESTIGATOR, ABEL PEREZ, TO KNOWINGLY TAKE A FALSE STATEMENT FROM EDDIE FARIAS; AND, THEREAFTER, TO KNOWINGLY USE SAID PERJURED TESTIMONY.

According to the affidavits of defense investigator, MARGARITO MORIN,

CutePDF - www.tesloo.com

the trial defense attorney was aware that the statements of Eddie Farias were false and perjured; but, at no time before or during the jury trial, did the defense attorney impeach said witness or make it known to the fact finders that the testimony was false and perjured.  Furthermore, the State prosecutors failed to inform the Applicant's attorney that:

a. Eddie Farias had been threatened by a law enforcement officer and later by a prosecutor that Farias could be charged with the offense of the murder and get life in prison, (based on statements the investigator already had in his possession) unless the said witness cooperated with the State;

b. Eddie Farias had been threatened by a law enforcement officer and later by a prosecutor that Farias could be charged with the offense of perjury - - if Eddie Farias did not "stick to his testimony," (to wit: in harmony with what was on Eddie Farias's statement that was taken and reduced to writing by Investigator Abel Perez);

c. If Eddie Farias became a witness in the case, (to wit: for the State) then they (the State) would not send Eddie Farias to prison;

d. That Eddie Farias had told the prosecution that "he guessed" that is how it all happened - - as the police officer had been reading it to him from the statements of other witness;

e. That, on the same day, after Eddie Farias met with the Applicant's trial attorney, Hector Villarreal, outside of the Cameron County Hall of Justice, Eddie Farias was interviewed by another officer of the State; that Farias had advised that officer that what was on the paper (his written statement) was a lie; that Farias had

told that officer that the first investigator, "...had told me that I could perjure myself or I could be put in prison for murder;" and that when Eddie Farias told the second officer 'it is not true,' the officer told Eddie that he could perjure himself or be charged with the murder and get 50 to 100 years or life in the pen;

f. The next day, when yet another State employee drove Eddie Farias to Court, on the same day that Farias testified, that Farias was told that he had to go with what was in his perjured statement; and, the State official allegedly said, "... stick with your statement to the investigator or go to prison for murder or perjury."

g. Eddie Farias also told a defense investigator that one attorney for the State had earlier threatened him by saying, "...if you testify who Jose Luis Trevino is, you will be charged for the murder."

h. Eddie Farias falsely told the State's investigating officers, a State prosecutor, and eventually the jury that he, Trevino, was not at the beach the day that the murder took place.

Clearly, the Applicant is entitled to a hearing on the issue of whether or not the State threatened a key witness and encouraged him to lie as the witness claims in his statement to the Applicant's investigator.

## ISSUE NUMBER THREE RESTATED:

ISSUE NO. 3: WHETHER, BASED ON THE EVIDENCE ADDUCED AT TRIAL, EXCLUDING THE PERJURED TESTIMONY OF EDDIE FARIAS, AND VIEWING THE EVIDENCE IN LIGHT OF THE TEXAS ACCOMPLICE-WITNESS RULE, NO RATIONAL TRIER OF FACT COULD HAVE FOUND PROOF OF GUILT BEYOND A REASONABLE DOUBT.

In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court held that in a challenge to a state conviction brought under Habeas Corpus statute, which requires federal court to entertain state prisoner's claim that he is being held in custody in violation of the Constitution or laws of the U.S., the applicant is entitled to Habeas Corpus relief if it is found that upon the evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.

In reviewing the sufficiency of the evidence, in a direct or circumstantial evidence case, a reviewing court is asked to determine whether, based on the evidence viewed in the light most favorable to the verdict, a rational jury could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Geesa v. State*, 820 S.W.2d 154,155-61 (Tex.Crim.App. 1991).

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; the corroboration is not sufficient if it merely shows the commission of an offense. *Vernon's Ann. Texas C.C.P., Art. 38.14.*

By definition, a party who is a charged principal, and who testifies, is an accomplice as a matter of law - - insofar as another party is concerned. Likewise, if a witness is indicted for the same offense, he is an accomplice as a matter of law - - regardless of other evidence (or lack of it) linking that witness to the crime. *Texas Penal Code, Sec. 7.02 (a)*; and *Johnson v. State*, 244 S.W.2d 235 (Tex.Crim.App.

1951).

An accomplice is a person who has been a participant in the alleged crime either before, during, or after its commission. The participation must include some form of an affirmative act committed by the witness to promote the commission of the offense. *McFarland v. State* (Tex.Crim.App. 1986), 928 S.W.2d 482. The Applicant contends that in the instant case all the eye-witnesses were accomplices.

The test for determining the legal sufficiency of corroboration is to eliminate from consideration the evidence of the accomplice witness, and then examine the evidence provided by other witnesses with a view toward ascertaining if there is inculpatory evidence, that is evidence of an incriminating character, which tends to connect the defendant with the commission of the offense. If there is such evidence, the corroboration is sufficient; otherwise, it is not. The combined cumulative weight of the incriminating evidence furnished by non-accomplice witnesses, which tends to connect the accused with the commission of the offense, provides the test. It is not necessary that the corroboration directly link the accused to the crime, or be sufficient in itself, to establish guilt. Insignificant circumstances sometimes afford the most satisfactory evidence of guilt and corroboration of accomplice-witness testimony. *Reed v. State*, 744 S.W.2d 112 (Tex.Crim.App. 1988).

In the instant case, trial counsel should have tendered an instruction defining accomplices and the accomplice witness rule. Submitting said instruction was basic to a criminal defense in Texas in these premises. There is no reasonable explanation for trial counsel failing to do so. The Applicant is entitled to a full hearing on this

issue.

## ISSUE NUMBER FOUR RESTATED:

ISSUE NO. 4: WHETHER THE STATE FAILED TO COMPLY WITH ITS DUTIES UNDER *GIGLIO V. U.S.*, 405 U.S. 150, 92 S.CT. 763, 31 L.ED.2D 104 (1972) BY WITHHOLDING EVIDENCE REGARDING ITS PROMISE OF LENIENCY TO A KEY STATE WITNESS.

The trial court granted applicant's timely-filed pretrial motion requiring the State to reveal the State's deal with each witness who testified on behalf of the State. However, according to the statement of trial counsel, the State did not comply with its duties under *Giglio v. U.S.*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). [Government's withholding evidence regarding a promise of leniency to a government witness is ground for new trial.] In fact, according to counsel's statements, at no time before or during the jury trial, did the State prosecutors inform the Applicant's attorney that:

a. Eddie Farias had been threatened, first by a law enforcement officer and later by a prosecutor, that Farias could be charged with the offense of the murder of Moses Huerta, III, and get life in prison, based on statements that the investigator already had in his possession, unless he cooperated with the State;

b. Eddie Farias had been threatened first by a law enforcement officer, and later by a prosecutor, that Farias could be charged with the offense of perjury if Eddie Farias did not "stick to his testimony" - - in harmony with what was on Eddie Farias's statement that was taken and reduced to writing by Investigator Abel Perez;

c. If Eddie Farias became a witness in the case (for the State), then they (the

State) would not send Eddie Farias to prison;

d. That Eddie Farias had said that "he guessed" that is how it (the murder) had happened - - in harmony with what the police officer had been reading from the statements of other witnesses;

e. That, on the same day, after Eddie Farias had met with the Applicant's trial attorney, Hector Villarreal, outside of the Cameron County Hall of Justice, Eddie Farias was interviewed by another officer of the State, and that he advised the officer that what was on the paper (to wit: his written statement) was a lie; and, that when Farias advised the second officer, that the first investigator, "...had told me that I could perjure myself or I could be put in prison for murder;" and that when Eddie Farias responded, "...but it is not true," the officer told Eddie that he could perjure himself or be charged with the murder and get 50 to 100 years or life in the pen;

f. The next day, a new State employee, drove Farias to Court; and on the day Farias testified, the driver told Farias, in the car on the way to court, that Eddie Farias had to "go with what the statement," and the officer also allegedly said, "... stick with your statement to the investigator or go to prison for murder or perjury."

g. Eddie Farias alleges that one attorney for the State had earlier threatened him by saying, "...if you testify who Jose Luis Trevino is, you will be charged for the murder."

h. Eddie Farias allegedly told the State's investigating officers, the State's prosecutor, and finally the jury that he, Trevino, was not at the beach the day that the murder happened.  This testimony he alleges was false yet knowingly used by the

State.

The State's withholding from an accused evidence favorable to the defense on the issue of guilt or punishment denies the accused due process of law. ***Brady v. Maryland***, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

An evidentiary hearing is required to determine if an alleged promise of leniency was made before testimony by a witness - - contrary to his testimony at trial. ***DeMarco v. U.S.***, 415 U.S. 449, 94 S.Ct. 1185, 39 L.Ed.2d 501 (1974).

## CONCLUSION

For the reasons set forth and discussed above, the petitioner submits that he was denied his Sixth Amendment right to the effective assistance of counsel, that he has established probable cause for this Honorable Court to believe his allegations, and that he is therefore entitled to an evidentiary hearing on the issue of the ineffective assistance of counsel.

The petitioner prays for a hearing on the issue of whether he was provided the effective assistance of counsel or was not. He also prays for whatever relief is deemed just, in these premises. The only effective relief would be a new trial.

Respectfully submitted,

Attorney for the Applicant

William Edward May, Jr.
Attorney at Law
Texas State Bar No. 13271600
6000 S. Staples, Suite 404
Corpus Christi, TX 78413
Phone: (361) 994-0322
Fax: (361) 994-9285

28

STATE OF TEXAS    )
           ) SS
COUNTY OF NUECES  )

## <u>AFFIDAVIT OF COUNSEL</u>

BEFORE ME, the undersigned authority, on this day personally appeared attorney WILLIAM EDWARD MAY, JR., and after being by me first duly sworn deposed on his oath and said:

"My name is WILLIAM EDWARD MAY, JR., I am the attorney for Applicant, . I have read the foregoing Application for Writ of Habeas Corpus to which this affidavit is attached and which is to be filed in the aforesaid cause. All of the facts and allegations contained in said Application are true to the best of my knowledge and belief."



_____
Attorney, William Edward May, Jr.

SUBSCRIBED AND SWORN TO before me by the said _____ on this the _11 7TH_ day of _JULY_____, 2000.

_____
Notary Public, State of Texas
(seal)

> BRADLEY BATES
> NOTARY PUBLIC
> STATE OF TEXAS
> MY COMM. EXP. 02-06-2004

# CERTIFICATE OF SERVICE

I, William Edward May, Jr., Attorney at Law, certify that on this date I served a copy of the foregoing document by sending it to the District Attorney for the 138th District of Cameron County, Texas, Cameron County Courthouse, Brownsville, Texas 78520, by mailing it from a United States Post Office, by certified mail, with return receipt requested, and with postage fully prepaid on this the _11TH_ day of ___JULY___, 2000.

I further certify that a true and correct copy of the foregoing Petition for a Writ of Habeas Corpus has been mailed by certified mail, with return receipt requested, and with postage fully prepaid, to the State Prosecuting Attorney, PO Box 12405, Austin, Texas 78711, on the _11TH_ day of ___JULY___, 2000.

_____
Attorney at Law

William Edward May, Jr.
Attorney at Law
Texas State Bar No. 13271600
6000 S. Staples, Suite 404
Corpus Christi, TX 78413
Phone: (361) 994-0322
Fax: (361) 994-9285

# APPENDIX OF EXHIBITS

*Exhibit A,*
the district court's judgment and sentence in cause no. 92-CR-933-B;

*Exhibit B,*
the grand jury's indictment in cause no. 92CR-933-B;

*Exhibit C,*
the Court's Charge to jury in cause no. 92-CR933-B;

*Exhibit D,*
the Court of Appeals' judgment and opinion in cause no. 13-93-136-CR;

*Exhibit E,*
the affidavit of Margarito Morin;

*Exhibit F,*
the court reporter's partial statement of facts - - of Eddie Farias's testimony during the State's direct examination (CR 270-284); and

*Exhibit G,*
defense counsel's trial motion - - for State to reveal any agreements.

Case 1:00-cv-00129    Document 1    Filed in TXSD on 08/10/2000    Page 30 of 103

CAUSE NO. 92-CR-933-B

| | | |
|---|---|---|
| THE STATE OF TEXAS | )( | IN THE 138TH DISTRICT COURT |
| VS. | )( | OF |
| REYNALDO COBIO CERVANTES | )( | CAMERON COUNTY, TEXAS |

### JUDGMENT ON JURY VERDICT OF GUILTY
### PUNISHMENT FIXED BY COURT - NO PROBATION GRANTED

Judge Presiding: Hon. Robert Garza    Date of Judgment: 12/16/92

Attorney
for State: Oscar Ponce

Attorney
for Defendant: Hector Villarreal

Offense Convicted of: Felony Murder

Degree: First Degree Felony

Date Offense
Committed: March 14, 1992

Charging
Instrument: Indictment

Plea:    Not Guilty

Jury Verdict:   Guilty    Foreman: Ricardo C. Santillan

Plea to Enhancement
Paragraph(s)   n/a

Enhancement
Paragraph(s): n/a

Findings on Use
of Deadly Weapon: True

Punishment assessed by: Court

Date Sentence Imposed: 12/10/92    Costs:  $106.50

Punishment and Place
of Confinement:  LIFE in TDCJ-ID    Date to Commence: 12/10/92

Time Credited:  (269) days

Total amt of  $8,350.00 as a
Restitution:  condition or parole

Concurrent Unless
Otherwise Specified: n/a

EXHIBIT "A"

CAUSE NO. 92-CR-933-B

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT OF |
| VS | : | CAMERON COUNTY, TEXAS |
| REYNALDO COBIO CERVANTES | ) | 138TH JUDICIAL DISTRICT |

### JUDGMENT OF CONVICTION AND SENTENCE

BE IT REMEMBERED that on the 9th day of November, 1992, this cause was called to trial and the State appeared by her Assistant Criminal District Attorney, and the Defendant, Reynaldo Cobio Cervantes, appeared in person, his counsel by employment, the Hon. Hector Villarreal also being present, and the Defendant, having been duly arraigned, pleaded Not Guilty and both parties announced ready for trial; thereupon a jury of good and lawful persons, to wit: Ricardo C. Santillan and eleven others, was duly selected, empaneled and sworn according to the law and charged by the Court on separation; whereupon said cause was recessed until November 10, 1992.

THEREAFTER, on November 10, 1992, the indictment was read to the jury and the Defendant entered his plea of Not Guilty thereto whereupon the State introduced evidence and rested. Defendant introduced evidence, through November 17, 1992, whereupon State offered rebuttal evidence. All parties closed, whereupon the charge was prepared and submitted to all counsel and the case recessed until November 18, 1992.

THEREAFTER, on November 18, 1992, the Court charged the jury as to the law applicable to said cause and argument of counsel for the State and the Defendant was duly heard and concluded, and the jury retired in charge of the proper officer to consider their verdict, and afterward was brought into open court by the proper officer, the Defendant and his counsel being present, and in due form of law returned into open court the following verdict, which was received by the Court and is here now entered upon the Minutes of the Court, to wit:

"We, the Jury, find the Defendant, Reynaldo Cobio Cervantes, "GUILTY" of the offense of Felony Murder as charged in the Indictment.

Ricardo C. Santillan
Presiding Juror"

*  *  *  *  *

If you have found the Defendant, Reynaldo Cobio Cervantes, Guilty of the offense of Felony Murder, and only in that event, answer the Question; otherwise, do not answer the Question.

### QUESTION

Do you find from the evidence beyond a reasonable doubt that the Defendant, Reynaldo Cobio Cervantes, used a deadly weapon, to wit, a tire tool, during the commission of the offense for which you have found him guilty?

You will answer "YES" or "NO".

We, the Jury answer: _____Yes_____

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED by the Court that the Defendant, Reynaldo Cobio Cervantes, is guilty of the offense of Felony Murder as found by the jury, and that said offense was committed on March 14, 1992.

THEREUPON, the Defendant, having previously elected in writing to have his punishment assessed by the Court, said jury was discharged and the cause recessed until November 10, 1992.

THEREAFTER, on November 10, 1992, all parties announced ready for further hearing, the cause proceeded on the punishment phase and evidence for the State and for the Defendant was duly presented and arguments of counsel heard and the Court having adjudged the Defendant guilty of the offense of Felony Murder as found by the jury,

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that the Defendant, Reynaldo Cobio Cervantes, be punished by confinement in the Texas Department of Criminal Justice - Institutional Division for a term of Life and that the State of Texas do have and recover of the said Defendant Reynaldo Cobio Cervantes all costs in this prosecution expended, and for which execution will issue. And the Jury having found that the Defendant, Reynaldo Cobio Cervantes, used a deadly weapon during the commission of

this offense and that the deadly weapon used by and exhibited by the Defendant was a tire tool, this affirmative finding is made a part of the Judgment of the Court in accordance with the provisions of Article 42.12 Sec. 3f (a) (2) Code of Criminal Procedure of the State of Texas.

And thereupon, the Defendant, Reynaldo Cobio Cervantes, was asked by the Court whether he had anything to say why said sentence should not be pronounced against him, and he answered nothing in bar thereof. Whereupon, the Court proceeded, in the presence of the said Defendant, Reynaldo Cobio Cervantes, to pronounce sentence against him as follows:

It is the order of the Court that the Defendant, Reynaldo Cobio Cervantes, who has been adjudged to be guilty of Felony Murder and whose punishment has been assessed by the Court at confinement in the Texas Department of Criminal Justice - Institutional Division for a term of Life, be delivered by the Sheriff of Cameron County, Texas, immediately to the Director of Corrections of the Texas Department of Criminal Justice - Institutional Division, or other person legally authorized to receive such convicts, and the said Reynaldo Cobio Cervantes shall be confined in said Texas Department of Criminal Justice - Institutional Division for a term of Life, in accordance with the provisions of the law governing the penitentiaries and the Texas Department of Criminal Justice - Institutional Division; it is further ordered by the Court that the Defendant be credited on this sentence with two hundred sixty-nine (269) days, on account of the time spent in jail in said cause since his arrest and confinement until sentence was pronounced by the Court. And the said Reynaldo Cobio Cervantes is hereby remanded to jail until said Sheriff can obey the directions of this sentence.

IT IS FURTHER ORDERED by the Court that defendant's left or right index thumb be fingerprinted, and that said fingerprint be marked as Exhibit "A" and is made a part hereof for all purposes.

SIGNED FOR ENTRY: December 16, 19

ROBERT GARZA
Judge Presiding

AURORA DE LA GARZA, DIST. CLERK

DEC 1 7

VOL. 159 PAGE 013

119

CAUSE NO.: #92-CR-933-B

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT OF |
| VS. | : | CAMERON COUNTY, TEXAS |
| REYNALDO COBIO CERVANTES | ) | 138TH_____ JUDICIAL DISTRICT |

### FINGERPRINT OF DEFENDANT'S THUMB

The following is the fingerprint of the right thumb print of:

_____REYNALDO COBIO CERVANTES_____, Defendant in this cause,

_____ in this Court:



(Defendant's Initials)

Taken on this _24th_ day of _November_, 19_92_ by:

_____
(Signature)

_____
Title of Person Authorized
To Take Fingerprints

Judgment signed for entry herein the _16th_ day of _Dec._
19_92_.

E X H I B I T   "A"

VOL. 159 PAGE 014

120

# IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS

THE GRAND JURORS, for the County of Cameron, State aforesaid, duly organized as such at the JULY

Term, A.D. 19 92, of the **107TH** JUDICIAL DISTRICT in and for

said County, upon their oaths in said Court, present that (REYNALDO COBIO CERVANTES, ROLANDO (CRUZ, MANUEL GARCIA, ROBERTO GARZA, (GERARDO GUTIERREZ, CLAUDIA (GARCIA, JOE MORIN AND MAURICIO PEREZ)

hereinafter called Defendants,

on or about the **14TH** day of **MARCH** A.D. One Thousand Nine

Hundred and **NINETY-TWO** and anterior to the presentment of this indictment, in the County of

Cameron and State of Texas, did then and there unlawfully , while in the course of

committing and attempting to commit the offense of ROBBERY of MOISES

HUERTA, III, intentionally cause the death of MOISES HUERTA, III, by

striking MOISES HUERTA, III with a tire tool,

AND THE GRAND JURORS aforesaid, upon their oaths in said court,
present that the Defendants on or about the 14th day of March, 1992,
and anterior to the presentment of this Indictment, in the County of
Cameron and State of Texas, did then and there unlawfully, with the
intent to cause serious bodily injury to MOISES, HUERTA, III, commit an
act clearly dangerous to human life that caused the death of MOISES
HUERTA, III, said act being: striking MOISES HUERTA, III with a tire
tool, that in the manner of its use and intended use was capable of
causing serious bodily injury or death,

EXHIBIT "B"

against the peace and dignity of the State.

Foreman of the Grand Jury

92-CR-933 -B

COUNTY OF CAMERON

I, AURORA DE LA GARZA, Clerk of the District Courts of Cameron County, Texas, do hereby certify that the within and fore-

going is a true and correct copy of the Original Bill of Indictment, filed in said Court on_____

_____ A. D. 19____ in Cause No._____, styled the State of Texas vs.

_____

_____

Given under my hand and seal of said court, at office in Brownsville, Texas, this_____ _____day

of_____ A. D. 19____

AURORA DE LA GARZA , Clerk

By_____Deputy

THE STATE OF TEXAS

REYNALDO COBIO CERVANTES, ROLANDO CRUZ, MANUEL GARCIA, ROBERTO GARZ, GERARDO GUTIERREZ, CLAUDIA GARCIA JOE MORIN AND MAURICIO PEREZ

INDICTMENT

OFFENSE:

CAPITAL MURDER AND MURDER

LUIS V. SAENZ
Criminal County Attorney

A TRUE BILL

Fernando Grand Jury

Filed AUG 12 1992

AURORA DE LA GARZA, CLERK OF DISTRICT COURTS OF CAMERON COUNTY TEXAS
By_____Deputy

19___

Amount of Bail $_____

# EXHIBIT "C"

CAUSE NO. 92-CR-933-B

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT OF |
| VS | : | CAMERON COUNTY, TEXAS |
| REYNALDO COBIO CERVANTES and MANUEL GARCIA | ) | 138TH JUDICIAL DISTRICT |

FILED 9:30 O'CLOCK ___A___ M.
NOV 18 1992
DISTRICT COURT, CAMERON COUNTY, TEXAS
BY _____ AYDEE SAENZ, DIST. CLERK

## COURT'S CHARGE TO THE JURY

The Defendants, Reynaldo Cobio Cervantes and Manuel Garcia stand charged with the offense of Felony Murder, alleged to have been committed on or about the 14th day of March, 1992, in Cameron County, Texas. Both Defendants have plead not guilty.

### 1.

Our law provides that a person commits the offense of murder if he intentionally or knowingly causes the death of an individual or if he, with the intent to cause serious bodily injury to another, commits an act clearly dangerous to human life that causes the death of an individual.

### 2.

A person acts "intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

97

A person acts "knowingly", or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly or with knowledge with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

3.

All persons are parties to an offense who are guilty of acting together in the commission of an offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense.

In this connection, however, the mere presence of a party at or near the scene of the commission of the offense does not make him a party to the offense. Likewise, mere knowledge that an offense is about to be committed by others will not make him a party to the offense, nor will his knowledge that the offense is being committed by others, or has been committed by others, nor will his failure to give alarm, his silence or inaction, make him a party to the offense.

98

**4.**

A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that (1) a different offense was committed; or (2) a different person or property was injured, harmed, or otherwise affected.

**5.**

Now, if you find from the evidence beyond a reasonable doubt that on or about the 14th day of March, 1992, in Cameron County, Texas, Reynaldo Cobio Cervantes, acting alone or with another, did then and there unlawfully, with the intent to cause serious bodily injury to Moises Huerta, III, commit an act clearly dangerous to human life that caused the death of Moises Huerta, III, said act being: striking Moises Huerta, III with a tire tool, that in the manner of its use and intended use was capable of causing serious bodily injury or death, then you will find the defendant guilty of the offense of Felony Murder, as charged in the Indictment.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the Defendant of the offense of Felony Murder, as charged in the Indictment and say by your verdict not guilty.

**99**

6.

Now, if you find from the evidence beyond a reasonable doubt that on or about the 14th day of March, 1992, in Cameron County, Texas, Manuel Garcia, acting alone or with another, did then and there unlawfully, with the intent to cause serious bodily injury to Moises Huerta, III, commit an act clearly dangerous to human life that caused the death of Moises Huerta, III, said act being: striking Moises Huerta, III with a tire tool, that in the manner of its use and intended use was capable of causing serious bodily injury or death, then you will find the defendant guilty of the offense of Felony Murder, as charged in the Indictment.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the Defendant of the offense of Felony Murder, as charged in the Indictment and say by your verdict not guilty.

**100**

7.

You are instructed that if there is testimony before you in
this case regarding either of the Defendants' having committed
offenses other than the offense alleged against them in the
indictment in this case, you cannot consider said testimony for
any purpose unless you find and believe beyond a reasonable doubt
that the either Defendant committed such other offenses, if any
were committed, and even then you may only consider the same in
determining the intent, identity, proof of motive, opportunity,
plan, knowledge, or absence of mistake or accident of either
Defendant, if any, in connection with the offense, if any,
alleged against them in the indictment in this case, and for no
other purpose.

**101**

**8.**

A defense set up by each of the Defendants in this case is
what is known as an alibi, that is, that if the offense was com-
mitted, as alleged, that each Defendant was, at the time of the
commission thereof, at another and different place from that at
which such offense was committed and, therefore, was not and
could not have been the person who committed the same.   Now if
you have a reasonable doubt as to the presence of either or both
of the Defendants at the place where the offense was committed,
if an offense was committed, at the time of the commission
thereof, then you will find either or both Defendants not guilty.

**9.**

Our law provides that a Defendant may testify in his own
behalf if he elects to do so.   This, however, is a privilege
accorded a Defendant, and in the event he elects not to testify,
that fact cannot be taken as a circumstance against him.   In this
case, each of the Defendants has elected not to testify, and you
are instructed that you cannot and must not refer or allude to
that fact throughout your deliberations or take it into con-
sideration for any purpose whatsoever as a circumstance against
either Defendant.

**102**

10.

A "deadly weapon" means a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury, or anything that, in the manner of its use or intended use, is capable of causing death or serious bodily injury.

If, under the instructions given you herein, you find the Defendant, Reynaldo Cobio Cervantes, guilty of the offense of Felony Murder, and so state by your verdict, you will then next answer the Question:

### QUESTION

Do you find from the evidence beyond a reasonable doubt that the Defendant, Reynaldo Cobio Cervantes, used a deadly weapon, to wit, a tire tool, during the commission of the offense for which you have found him guilty?

You will answer "YES" or "NO".

103

CSIsPDF - www.texia.com

11.

A "deadly weapon" means a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury, or anything that, in the manner of its use or intended use, is capable of causing death or serious bodily injury.

If, under the instructions given you herein, you find the Defendant, Manuel Garcia, guilty of the offense of Felony Murder, and so state by your verdict, you will then next answer the Question:

<u>QUESTION</u>

Do you find from the evidence beyond a reasonable doubt that the Defendant, Manuel Garcia, used a deadly weapon, to wit, a tire tool, during the commission of the offense for which you have found him guilty?

You will answer "YES" or "NO".

*104*

A grand jury indictment is merely the means under our law by which a defendant is brought to trial in a felony prosecution. It is not evidence of guilt and you should not consider it in passing on the question of guilt of the defendant.

The burden of proof in all criminal cases rests upon the State throughout the trial, and never shifts to the defendant. All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that a person has been arrested, confined, or indicted for, or otherwise charged with, the offense gives rise to no inference of guilt at his trial. The law does not require a defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant.

The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the defendant.

It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all "reasonable doubt" concerning the defendant's guilt.

A "reasonable doubt" is a doubt based on reason and common sense after a careful and impartial consideration of all the evidence in the case. It is the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs.

**105**

Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

In the event you have a reasonable doubt as to the defendant's guilt after considering all the evidence before you, and these instructions, you will acquit him and say by your verdict "Not guilty."

You are the exclusive judges of the facts proved, of the credibility of the witnesses and the weight to be given their testimony, but the law you shall receive in these written instructions, and you must be governed thereby.

In order to return a verdict, each juror must agree thereto, but jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment.

Each juror must decide the case for himself or herself, but only after an impartial consideration of the evidence with his or her fellow jurors.

In the course of deliberations, a juror should not hesitate to re-examine his or her own views and change his or her opinion if convinced it is erroneous.  However, no juror should surrender his or her conviction as to the weight or effect of the evidence solely because of the opinion of their fellow jurors, or for the mere purpose of returning a verdict.

**106**

From time to time throughout the trial the Court has been called upon to pass on the question of whether or not certain offered evidence might properly be admitted. You are not to be concerned with the reasons for such rulings and are not to draw any inferences from them. Whether offered evidence is admissible is purely a question of law. In admitting evidence to which an objection is made, the Court does not determine what weight should be given such evidence; nor does it pass on the credibility of the witness. As to any offer of evidence that has been rejected by the Court, you, of course, must not consider the same; as to any question to which an objection was sustained, you must not conjecture as to what the answer might have been or as to the reason for the objection.

You are instructed that you are not to allow yourselves to be influenced in any degree whatsoever by what you may think or surmise the opinion of the Court to be. The Court has no right by any word or any act to indicate any opinion respecting any matter of fact involved in this case, nor the guilt or innocence of the Defendant. The Court has not intended to express any such opinion, and if you have observed anything which you have or may interpret as the Court's opinion upon any matter of fact in this case or of the guilt or innocence of the Defendant, you must wholly disregard it.

**107**

You are instructed that the statements of counsel made during the course of the trial or during the argument, if not supported by evidence, or statements of law made by counsel, if not in harmony with the law as stated to you by the Court in these instructions, are to be wholly disregarded.

After you retire to the jury room, you should first select one of your members as your Presiding Juror. It is the Presiding Juror's duty to preside at your deliberations, vote with you, and, when you have unanimously agreed upon a verdict, to certify to your verdict by using the appropriate form attached hereto, and signing the same as Presiding Juror.

During your deliberations in this case, you must not consider, discuss, nor relate any matters not in evidence before you. You should not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence. You must not discuss nor consider punishment during your deliberations. You are to concern yourselves solely with the question of guilt or innocence without any regard whatsoever to the possible punishment for the offense charged.

After you have retired, no one has any authority to communicate with you except the officer who has you in charge. Do not attempt to talk to the officer, or anyone else concerning any question you may have; instead address your inquiry to the Court in writing. Any such writing must be signed by the Presiding Juror.

**108**

After you have reached a unanimous verdict, the Presiding Juror will certify thereto by filling in the appropriate form attached to this charge and signing his or her name as Presiding Juror.  The Presiding Juror will then notify the officer who has you in charge that you have reached a verdict.  Afterwards you will then be brought into open court.

FILED: November *18*, 1992.

9:35 Am —

_____
Judge Presiding

**109**

CAUSE NO. 92-CR-933-B

| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT OF |
| VS | : | CAMERON COUNTY, TEXAS |
| REYNALDO COBIO CERVANTES and MANUEL GARCIA | ) | 138TH JUDICIAL DISTRICT |

### FORMS OF VERDICT

We, the Jury, find the Defendant, Reynaldo Cobio Cervantes, "NOT GUILTY" of the offense of Felony Murder as charged in the Indictment.

_____
Presiding Juror

We, the Jury, find the Defendant, Reynaldo Cobio Cervantes, "GUILTY" of the offense of Felony Murder as charged in the Indictment.

_____
Presiding Juror

FILED __:__ O'CLOCK ___ M
AURORA DE LA GARZA, DIST. CLERK

NOV 1 8 1993

DISTRICT COURT, CAMERON CO. TX
BY _____

116

* * * * *

If you have found the Defendant, Reynaldo Cobio Cervantes, Guilty of the offense of Felony Murder, and only in that event, answer the Question; otherwise, do not answer the Question.

## QUESTION

Do you find from the evidence beyond a reasonable doubt that the Defendant, Reynaldo Cobio Cervantes, used a deadly weapon, to wit, a tire tool, during the commission of the offense for which you have found him guilty?

You will answer "YES" or "NO".

We, the Jury answer: _____*Yes*_____

FILED 9:59 O'CLOCK ___ M
AURORA DE LA GARZA, DIST. CLERK

**NOV 1 8 1992**

DISTRICT COURT CAMERON COUNTY, TEXAS
BY _____ Dep.

**111**

* * * * *

We, the Jury, find the Defendant, Manuel Garcia, "NOT GUILTY" of the offense of Felony Murder as charged in the Indictment.

_____
Presiding Juror

We, the Jury, find the Defendant, Manuel Garcia, "GUILTY" of the offense of Felony Murder as charged in the Indictment.


_____
Presiding Juror

112

* * * * *

If you have found the Defendant, Manuel Garcia, Guilty of the offense of Felony Murder, and only in that event, answer the Question; otherwise, do not answer the Question.

<u>QUESTION</u>

Do you find from the evidence beyond a reasonable doubt that the Defendant, Manuel Garcia, used a deadly weapon, to wit, a tire tool, during the commission of the offense for which you have found him guilty?

You will answer "YES" or "NO".

We, the Jury answer: ___*Yes*___

FILED 3:50 O'CLOCK ___ P ___ M
AURORA DE LA GARZA, DIST CLERK

NOV 1 8 1997

DISTRICT COURT CAMERON COUNTY TEXAS
BY _____ DEPUTY

113

EXHIBIT "D"

## COURT OF APPEALS

### Thirteenth Judicial District

### Corpus Christi, Texas

Below is the JUDGMENT in the numbered cause set out herein to be Filed and Entered in the Minutes of the Court of Appeals, Thirteenth Judicial District of Texas, at Corpus Christi, as of the <u>21st day of July, 1994.</u>  If this Judgment does not conform to the opinion handed down by the Court in this cause, any party may file a motion for Correction of Judgment with the Clerk of this Court.

CAUSE NO. 13-93-136-CR            (Tr. Ct. No. 92-CR-933-B)

REYNALDO COBIO CERVANTES,                          Appellant,

v.

THE STATE OF TEXAS,                                Appellant,

on appeal to this Court from Cameron County, Texas.

\* \* \* \* \* \* \* \*

### J U D G M E N T

On appeal from the 138th District Court of Cameron County, Texas, from a judgment signed December 16, 1992.  Opinion by Justice J. Bonner Dorsey.  Opinion ordered not published. Tex. R. App. P. 90.

THIS CAUSE was submitted to the Court on January 26, 1994, on oral argument, the record, and briefs.  These having been examined and fully considered, it is the opinion of the Court that there was no error in the judgment of the court below, and said judgment is hereby AFFIRMED against appellant, Reynaldo Cobio Cervantes.

It is further ordered that this decision be certified below for observance.

\* \* \* \* \* \* \* \*

CATHY WILBORN, CLERK

| | | |
|---|---|---|
| CHIEF JUSTICE<br>ROBERT J. SEERDEN | **Court of Appeals** | CLERK<br>CATHY WILBORN |
| JUSTICES<br>NOAH KENNEDY<br>J. BONNER DORSEY<br>GILBERTO HINOJOSA<br>FEDERICO G. HINOJOSA JR.<br>LINDA REYNA YAÑEZ | **Thirteenth Judicial District**<br><br>TENTH FLOOR<br>NUECES COUNTY COURTHOUSE<br>CORPUS CHRISTI, TEXAS 78401 | DEPUTY CLERK<br>MARY JANE DUARTE<br><br>TELEPHONE: 512-888-0416<br>FAX: 512-888-0794 |

RECEIVED JUL 2 2 1994

July 21, 1994

TO ALL ATTORNEYS OF RECORD:

RE: Cause No. 13-93-136-CR
Tr.Ct.No. 92-CR-933-B
Reynaldo Cobio Cervantes
v.
The State of Texas

Dear Attorneys:

The judgment of the trial court in the above-referenced cause was this date AFFIRMED by this Court.

Copies of the opinion and judgment are enclosed.

Very truly yours,

Cathy Wilborn, Clerk

CW:jly
Enc.
cc: Hon. Hector J. Villarreal
Hon. Fred Leon
Hon. Luis V. Saenz
Hon. John A. Olson
Hon. Robert Garza, Presiding Judge
Hon. Aurora De La Garza, District Clerk



NUMBER 13-93-136-CR

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI

REYNALDO COBIO CERVANTES,                              Appellant,

v.

THE STATE OF TEXAS,                                    Appellee.

On appeal from the 138th District Court
of Cameron County, Texas.

# O P I N I O N

Before Chief Justice Seerden, Justices Kennedy and Dorsey
Opinion by Justice Dorsey

Reynaldo Cobio Cervantes was convicted by a jury of murdering Moises Huerta

III by beating him to death with a tire tool; he was sentenced by the court to life

imprisonment.  Cervantes challenges his conviction by four points of error claiming:

CutePDF - www.fsvloi.com

1) the trial court erred in failing to grant his motion for new trial based on newly discovered evidence; 2) it was error to allow evidence of extraneous offenses; 3) insufficient corroborating evidence was introduced at trial to support the conviction; and 4) there is a fatal variance between the charge and the jury's verdict. We affirm.

Cervantes was tried with co-defendant, Manuel Garcia.[1]  Both men were convicted and sentenced to life imprisonment. Huerta was killed March 14, 1992 at Andy Bowie Park, the beach near Port Isabel.

The murder took place spring break weekend. Huerta and five friends had gone to the beach in the afternoon and were leaving the beach between 7:00 and 7:30 in the evening. Huerta was driving slowly towards the park exit when several young men approached the car and asked the group if they had any beer. Huerta told them "no" and continued to drive forward. A few yards further up the beach, Huerta stopped the car. He got out and walked towards the rear of the car. He was gone a few minutes and one his passengers, Carlos Torres, got out of the car to see why Huerta was gone. After he got out he saw Huerta being beaten by a group of people behind the car. Torres rushed back and tried to stop the beating. The group began to beat and kick him too. When he realized he could not stop the assault, he managed to get up and run from the group. Torres said Huerta was surrounded by the men beating him. While Huerta was being beaten, another young man stuck his head into the car and pointed a gun at the rear seat passengers and ordered them out

---

[1]Garcia's conviction was appealed to this court.  See our opinion in <u>Manuel Garcia v. State</u>, No. 13-93-022-CR.

2

of the car. Other people were shaking the car and broke the car's windshield. Alex Richardson, who had been in the back seat, identified Garcia as the man who punched him in the stomach and threatened him as he was running from the car. Richardson testified that he was punched a couple of times. He estimated that he was 15 to 20 feet from Huerta at the time Garcia punched him. Huerta was being beaten by a single person with a four foot pole of some kind at the time. Huerta was no longer moving. At the time of the attack it was getting dark. Only Richardson was able to identify any of the men who attacked them.

Eddie Farias, a member of Tri-City Bombers, was with the gang at the beach that day. Although allegedly impaired by Quaaludes at time of the attack on Huerta, and not participating in it, Farias saw parts of it. He said that members of Tri-City Bombers surrounded the Huerta car and attacked the occupants. He testified that Huerta was struck repeatedly with a tire tool by appellant Cervantes, who was the leader of the gang.

That same evening, between 7:00 and 7:30 p.m., several other beach-goers were attacked as they were leaving Andy Bowie beach in approximately the same location as Huerta's attack. Diana Martinez testified that she and her family were leaving the beach when they were stopped by three men who asked for help. David Martinez, her husband, stopped the car and got out. He was attacked by a man with what appeared to be a pipe. She saw her husband being hit in the face with the pipe and blood spurting from his face. He was struck a number of time while he was trying to get back into the car and get away. While David was being beaten, another

3

man approached the car and tried to pull a passenger, Rolando Vasquez out. That same man struck the windshield with what Diana described as a shotgun. She got out of the car to help her husband and was stopped by a man with a gun who pointed it at her and told her she was not going anywhere. Another man came up behind her and told her "I would kill you right now, if I wanted to." There were three or four men around her husband, hitting him. Martinez identified Cervantes as the man who was striking her husband with a pipe. After a while, she heard Cervantes tell the others, "Ya vamos a poner le, ya" which she translated to mean, "Let's go. That's enough." Shortly after that, the men walked away.

Rolando Vasquez, Jr. testified that Garcia broke the windshield with what appeared to be a sawed-off shotgun. David Martinez identified Garcia as being part of the group that attacked him and his family, but he did not know what Garcia was doing as part of the group.

Lisa Jimenez testified that she and a friend were at Andy Bowie Park March 14, 1992, and started to leave the park about 7 p.m. As they were driving towards the exit to the park they were in a line of cars waiting to get out of the park. Two men approached their truck from the front to prevent them driving forward. One man moved around to the right side and reached in the truck. She hit one man's hand, he spit at her, and she threw a bottle at him. Jimenez identified Cervantes as the man who reached into her truck that day. They went to the police and reported the incident and then drove back to the beach location. When they arrived back at the location where the incident occurred, they saw Huerta lying in the sand. The area

was surrounded by police officers and an ambulance was there. The time between their incident and returning to the scene she estimated at between ten and fifteen minutes.

Cervantes filed a Motion for New Trial based on the discovery of new evidence. Jose Morin, who had also been indicted in Huerta's assault and murder, wrote to Cervantes counsel and claimed that he struck the fatal blow. Morin pled guilty pursuant to a plea bargain and was sentenced to fifty years imprisonment. Cervantes's trial was held November 9 through November 18, 1992. Morin entered his guilty plea on November 24, 1992, and wrote the letter exculpating Cervantes on or about December 22, 1992.

The motion is governed by Texas Rule of Appellate Procedure 30(b)(6) which provides that "[a] new trial shall be granted an accused . . . [w]here new evidence favorable to the accused has been discovered since trial."[2] The test to determine whether a new trial should be granted because of newly discovered evidence is the same as it was prior to the adoption of the Rules of Appellate Procedure. Price v. State, No. 94-10-163 (Tex. Crim. App. March 9, 1994) (en banc).

"A motion for new trial based on newly discovered evidence is addressed to the sound discretion of the trial court, and its decision should not be disturbed on appeal absent a clear abuse of discretion." Ramirez v. State, 830 S.W.2d 827, 830 (Tex. App.--Corpus Christi 1992, no pet.) (citing Jones v. State, 711 S.W.2d 35, 36 (Tex.

---

[2]This rule has been superseded by article 40.001 of the Code of Criminal Procedure effective September 1, 1993.

Crim. App. 1986)).  The trial court considers the motion based on the following factors:  1) the newly discovered evidence was unknown at the time of trial;  2) the movant's failure to discover the evidence was not due to his want of diligence;  3) the materiality of the evidence is such as would probably lead to a different result in another trial; and 4) the evidence is admissible, and not merely cumulative, corroborative, collateral, or impeaching.  Id.   If under the circumstances, the trial court believes the weight or credibility of the evidence would probably not bring about a different result after a new trial, it is within the court's discretion to deny the motion.  Id.; see also Drew v. State, 743 S.W.2d 207, 226 (Tex. Crim. App. 1987); Dedesma v. State, 806 S.W.2d 928, 934 (Tex. App.--Corpus Christi 1991, pet. ref'd).

At the hearing on appellant's motion for new trial, Morin testified and authenticated the letter he wrote to appellant's counsel.  The handwritten letter recited:

> We were drinking beer and having fun until 5:30 or 6:00 p.m.  Then we hedded to Andy bowie park.  On the way there we stopped at a store and I bought more beer.  Then we cruised the side of Andy bowie beach. At the way out we saw about 12 guy's parked. And we recognized one of them.  His name is Mando Gamez.  So we parked about 12 feet away and walked over there.  As we approached them I recognized another one.  Which his name is Rolando Garcia "el Shamu".  Those were the only two that I knew there.  So we were drinking beer.  When Mando took out a bottle of "wine-pisto".  I drank about a 1/4 or more straight. Then Shamu or Rolando then started to assault ongoing traffic.  Then it got a little dark and I fell asleep wasted.  When all of a sudden I heard screams.  I thought they had done something to my friend and I got a jack and hit somebody and left.  To the best of my knowledge on that day and time of the accident I don't recall seeing Manual Garcia Claudia Garcia Rey Cervantes Robert Garza Gerardo Gutierrez Rolando Cruz or Mauricio Perez Or to be more specific I haven't seen then in three years

until now here in the county jail.

I gave this statement on my own free will because all of those people are innocent.

Jose Morin

Morin was questioned by both appellant's counsel and the State. Morin's attorney, Mr. Padilla, objected to the questioning and asserted his client's Fifth amendment privilege. The letter was read and the witness admitted that he wrote the letter. The transcription of Morin's sentencing hearing was introduced into evidence at the hearing. At his own sentencing hearing Morin told the trial court that he got a jack and killed Huerta.

At Cervantes's motion for new trial hearing, Morin denied any coercion or threat or promises in exchange for writing the letter. Morin was generally uncooperative and refused to reveal many details of the night of March 14, 1992 other than those contained in the letter.[3] On crossexamination the following additional information

---

[3]The following sequence of questioning occurred:

Q: Who did you leave the scene with?
A: I don't wish to answer that.

The State requested the witness be forced to answer the question and the Court admonished Morin as follows:

Mr. Morin, you've agreed to answer a lot of these questions. And you yourself started answering all of these questions, when -- and if you're not going to plead at this time, I'm going to require that you answer that question, sir.

Q: Who did you leave with?
A: By myself.

Q: What did you leave in? . . . What is your response to the question? What did you leave in?
A: I have no response.
Q: Now why is that?
A: I don't wish to answer the question.

The Court admonished Morin again after which Padilla told the Court:

7

was elicited:

> Q:  So when you heard those screams, you immediately got up, and went and got the jack and immediately started hitting this person?
> A:  Well, no.  Not exactly.
> Q:  So, you saw what was happening?
> A:  Excuse me?
> Q:  You saw what was happening before you went to hit this person?
> A:  I just saw somebody there lying down on the ground.
> Q:  And then you went to hit this person with a jack?
> A:  Yes, sir.

Morin admits he was very drunk and has little memory of the events of that evening. He refused to identify the people he was with that night.

Morin also admits that he passed out for a time and that it was possible for Garcia and Cervantes to have arrived at the beach while he was passed out.  Morin identified Cervantes as a friend and someone he had known for three or four years. He denies that Cervantes assisted, aided, encouraged, or facilitated Morin's commission of the killing.  Morin confirmed that he did not speak to or have any communication with Cervantes's attorney, other than writing the one letter, prior to the motion for new trial hearing.

Padilla testified that he refused to give Cervantes's counsel permission to speak with Morin although permission had been requested.  Padilla further testified that at some other time, Morin had told him that Cervantes was at the beach the night Huerta was killed.

---

Your Honor, the Defendant [Morin] wishes not to answer that question Your Honor, and I have explained to him the possibilities of being found in contempt, and so much other nature.

8

The State produced one of their prosecutors who testified that plea agreements had been made with several of the people Morin named in his letter as not being present and the judicial confessions of each of those defendants admitted their presence and participation in the offense.[4]

In applying the four part test to determine whether a new trial should have been granted, appellant proved that he did not have actual knowledge of this exculpatory evidence and that using due diligence he could not have procured it prior to trial. Part three requires that the evidence be material and potentially outcome determinative. If the evidence is Morin's testimony, which cannot be assured given his performance at the hearing, his testimony, if believed, may be outcome determinative. However, Morin's testimony is incredible and directly conflicts with the testimony of disinterested witnesses. There is nothing in Morin's testimony that can be confirmed other than the presence of "el Shamu" and Rolando Garcia whose presence at the beach that evening was confirmed by Edward Farias. The trial judge could have believed that Morin was not a credible witness and that contradictions in his testimony make it extremely unlikely that the outcome of any new trial would be different. In addition, Cervantes was convicted as a party to the offense. Morin's testimony does not negate Cervantes's presence and participation in the attack on Huerta.

The fourth prong of the test requires that the evidence be admissible. Morin's testimony about his own actions is admissible. If he refuses to testify and the letter

---

[4]Gerardo Gutierrez was specifically named.

9

is the only evidence, it is hearsay. It may nonetheless be an exception to the hearsay rule admissible as a statement against penal interest. TEX. R. CRIM. EVID. 803(24). However, as such it exculpates someone else and must be corroborated to indicate the trustworthiness of the statement. See McFarland v. State, 845 S.W.2d 824 (Tex. Crim. App. 1992); Green v. State, 840 S.W.2d 394 (Tex. Crim. App. 1992). There is little that can be corroborated from the bare recitation of the facts in the letter. Under these circumstances, we cannot say that the trial court abused its discretion in denying appellant's motion for new trial. Point one is overruled.

Appellant next contends that the trial court erred in admitting evidence of two extraneous offenses. The first complaint is that the court permitted Farias to testify that Cervantes was the head of the Pharr Tri-City Bombers and that the Pharr faction of the gang was associated with the Texas Syndicate, a prison gang. The second complaint is of the admission into evidence of the other assaults on the beach the same evening.

Generally extraneous offenses are not admissible unless they are offered to prove something other than general criminality, such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX. R. CRIM. EVID. 404(b); See Albrecht v. State, 486 S.W.2d 97, 100 (Tex. Crim. App. 1972). The testimony relating to the other assaults that same evening was admissible for the purpose of demonstrating a plan between the parties to the offense. The offenses were similar in the manner of their commission, committed at the same place and very close in time. The evidence is also admissible to prove Cervantes presence

10

at the beach at that time which he denies. Id. at 101 (rebuttal of defensive theory is common situation giving rise to admission of extraneous offenses).

The evidence about the connection between Cervantes's gang and the Texas Syndicate came from Edward Farias. Farias testified about the Tri-City Bombers and their activities on direct and crossexamination. During crossexamination, Garcia's counsel asked a series of questions about the purpose and the function of the TCB gang. Farias had responded that the gang was not organized to commit crimes, that any criminal activity was individually motivated rather than being a product of organized gang activity. The Pharr gang's affiliation with the Texas Syndicate was elicited on re-direct examination by the State as follows:

> Q: And do you recall whether or not an association with the Texas Syndicate, a prison gang --
> Counsel for Cervantes: Your Honor, I object. It is leading and not relevant.
> Court: I'll allow it. Overruled.
> Counsel: May we approach the bench briefly, sir?
> Court: Go ahead.
> (Bench Conference held)

> Counsel: Judge, to allow him to go into this area, and trying to tell people that they were involved in extraneous offenses by saying that they were involved with the Texas Syndicate, we are not aware of that, and it has no relevancy at all. It would be, in essence, trial by association as opposed to a judge or jury.
> Court: I think the door has been opened in that regard. I will allow it. . . . It will be overruled.
> (Bench Conference ends)
>       * * * *
> Q: Mr. Hoffman [counsel for Garcia] asked you, if the purpose or the function of the Tri-City Bombers was to commit other crimes. I believe those were his words. Do you recall that?
> A: Yes sir.
> Q: Do you know whether or not the Tri-City Bombers were organized to commit other crimes, and to do things that were illegal?

11

A: Well, the Lopez ones, they didn't.

Q: What about Pharr?

A: Well, I heard that they got involved

Counsel: Objection, Your Honor.

A: with the Texas Syndicate

Court: I will allow it, overruled.

• • • •

Q: What was the purpose of associating with the Pharr TCB'ers-- with the Texas Syndicates?

A: I don't understand your question.

Q: What was going to happen when the Pharr TCB'ers, Rey Cervantes's group, became associated with the Texas Syndicate? What were they going to do?

A: They were going to move drugs.

Q: So when Mr. Hoffman asked you whether or not the TCB'ers were organized to commit other crimes the answer to that is what?

A: Yes.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (opinion on reh'g). The list of permissible uses of extraneous offenses in Rule 404 is not exclusive, but merely illustrative. Bishop v. State, 860 S.W.2d 342, 345-46 (Tex. Crim. App. 1993); Albrecht, 486 S.W.2d at 101; Michel v. State, 745 S.W.2d 497, 498 (Tex. App.--Corpus Christi 1988, no pet.). It is clear that the trial judge believed the evidence to be relevant and proper rebuttal testimony to prevent the jury from being left with a misleading or false impression regarding the "innocent" gang activity left after Garcia's crossexamination. It is always proper to clarify a witness's testimony on redirect even when doing so introduces extraneous matters that would not be originally admissible on direct examination if the intervening examination opens the door. See McDonald v. State, 513 S.W.2d 44, 49-51 (Tex. Crim. App. 1974) (involving State's rebuttal evidence); Monkhouse v. State, 861 S.W.2d 473, 476

12

Case 1:00-cv-00129   Document 1   Filed in TXSD on 08/10/2000   Page 68 of 103

(Tex. App.--Texarkana 1993, no pet.) (evidence elicited on crossexamination to rebut impression from direct examination); <u>Michel</u>, 745 S.W.2d at 498. The objected to evidence was relevant. The trial judge did not abuse his discretion in permitting the testimony.

Additionally, we question whether the error, if any, was preserved. Appellant clearly made a relevancy and an extraneous offense objection as required. He did not object that the probative value of the evidence was substantially outweighed by its unfair prejudicial effect on the defendant and thus request the court balance the competing interests as required. TEX. R. CRIM. EVID. 403; <u>Montgomery</u>, 810 S.W.2d at 388. Appellant's objection, "It would be, in essence, trial by association" includes the bare inference of prejudice. The party opposing the evidence is required to make clear his objection and the basis for it. We overrule appellant's second point of error.

Appellant's third point of error contends that Farias's testimony was that of an accomplice and must be corroborated. The basis for appellant's claim that Farias was an accomplice is Diana Martinez's testimony that a shotgun was used to break the Martinez's car windshield and Farias's testimony that he found a shotgun in his car which he removed and tossed into Mando Gamez's car. Initially, Farias did not tell the State or anyone else about the shotgun. Appellant contends that Farias's actions constitute a cover-up and that he is therefore an accomplice whose testimony must be corroborated for the conviction to stand.

Appellant did not request and the Court did not charge the jury on the issue of accomplice witness testimony nor did appellant object to the charge on that basis.

13

Unobjected to error in the court's charge is reversible only if the error was so egregious and created such harm to the defendant that the defendant did not receive a fair and impartial trial. Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

First we determine whether Farias was an accomplice witness. An accomplice witness is one who participates with the accused before, after, or during the offense for which the accused is on trial. Brooks v. State, 686 S.W.2d 952, 957-58 (Tex. Crim. App. 1985). A witness who knows about a crime is not an accomplice merely because he fails to disclose it or even if he conceals it; neither does mere presence make one an accomplice. Id.

Farias was not charged with any offense connected with the assaults at Andy Bowie beach that night. He testified that he did not participate in any of the assaults and no other evidence connects him to the commission of the offenses. No testimony connects the shotgun he removed from his car with the assaults. There is no evidence that Farias was an accomplice. The trial court did not err in failing to charge the jury on the law of accomplice witnesses.

We also consider appellant's complaint as a general challenge to the sufficiency of the evidence to convict him. We review the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found all of the elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318 (1979); Olurebi v. State, 870 S.W.2d 58, 61 (Tex. Crim. App. 1994); Navarro v. State, 776 S.W.2d 710, 712 (Tex. App.--Corpus Christi 1989, pet. ref'd).

14

Cervantes was convicted of felony murder with a finding of use of a deadly weapon. The jury was charged on the law of parties, the jury could have convicted Cervantes either as a party or as the actual striker of the fatal blows.

The evidence places Cervantes at the scene of two assaults on March 14, committed in a similar manner. Both cars were stopped on Andy Bowie beach by two or three men as they were approaching the exit to the park between 7 and 7:30 p.m.; both drivers were assaulted when they got out of their cars for no apparent reason; the remaining passengers were threatened by another man with a gun; the windshields of both cars were smashed; any passengers who attempted to help the drivers were threatened and/or assaulted; the groups quickly swelled from two or three to more than six people, and both drivers were viciously assaulted with a pipe-type object. Cervantes was identified as the person who struck David Martinez in the face with a pipe type object. He was also identified by Farias as the person who struck Huerta. Although Farias testified once that Cervantes struck Huerta and at another time testified that he couldn't tell who struck Huerta, the inconsistencies in his testimony affect only the weight and credibility of his testimony.

Additional testimony places Cervantes's very conspicuous customized red pick up truck at the beach that afternoon and evening. Officer Kimberly Sue Sanchez testified that she was working patrol on March 14 for the South Padre Island Police Department and noticed a red pickup truck which she described as having a customized paint job, a sun visor extending over the cab of the truck, a sport fin on the rear bed and a cloth-type roof. She saw the truck on Park Road 100 between

15

noon and 1 p.m. heading towards the beach. She could not identify the driver because the windows had a very dark tint; she saw two men and two women in the truck. Traffic was very heavy because of Spring Break and she observed the truck for three to four minutes while she was driving behind it. She also noticed that it had paper license plates.

Farias testified that he saw Cervantes's customized red truck at the beach as it was getting dark and that the truck was parked near where he was at the beach. He saw two or three people in the truck with the driver. He was told that Cervantes was driving but he did not see him in the truck.

Sanchez was called to the beach after Huerta was killed and saw what she described as the same red truck parked 30 to 40 yards away.

Cervantes produced witnesses who testified that he was elsewhere that evening and introduced an Auto Zone receipt showing that he was buying parts for his truck at the time of the murder. His alibi witnesses included Virginia Ramirez, his girlfriend; Mirna Solis, her friend; Rey De Los Angeles; Maria De Los Angeles; Eduardo Zuniga; Juan Ramon Garcia; and Arturo Garza.

Ramirez was the primary defense witness. She dated Cervantes for seven years and has a son by him. On March 14, she withdrew a theft and assault complaint against Cervantes. She testified that she was with Cervantes from about 3:30 p.m. March 14 until about 6:00 p.m. and that they were running errands with their son in preparation for a party. She spoke to Cervantes on the phone at 8 p.m.

16

and saw him again between 9:30 p.m. and midnight. She testified that she took a number of photos both the 14th and the 15th of Cervantes and their son.

Other witnesses testified that Cervantes was at Wal-Mart with Ramirez late the afternoon of March 14, that he loaned his truck to Arturo Garcia to pull a boat to another town for repair that day, and that Cervantes was at Auto Zone buying fuses for his truck in the early evening of March 14. Yet other witnesses testified that the receipts tendered into evidence had been obtained after Cervantes was arrested.

The jury is the sole judge of the weight and credibility of the witnesses. Penagraph v. State, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981). A jury is entitled to accept one version of the facts and disregard another. Id.

The jury charge asked the jury whether both men, acting

with the intent to cause serious bodily injury to Moises Huerta, committed an act clearly dangerous to human life that caused the death of Moises Huerta, III, said act being: striking Moises Huerta, III with a tire tool, that in the manner of its use and intended use was capable of causing serious bodily injury or death . . .

Considering the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that the evidence of the two similar assaults established the requisite agreement between Garcia and Cervantes to assault beach-goers the evening of March 14, 1992. A rational jury could also have found that the assaults on Martinez and Huerta were acts clearly dangerous to human life and that Garcia and Cervantes intended to cause serious bodily injury to both victims. We overrule point three; the evidence is sufficient to support conviction.

17

Appellant's final point of error claims there exists a fatal variance between the indictment and the verdict form. The indictment on which appellant was tried read as follows:

> while in the course of committing and attempting to commit the offense of ROBBERY of MOISES HUERTA, III, by striking MOISES HUERTA, III, with a tire tool,
>
> AND THE GRAND JURORS aforesaid, upon their oaths in said court, present that the Defendants . . . did then and there unlawfully, with the intent to cause serious bodily injury to MOISES HUERTA, III, commit an act clearly dangerous to human life that caused the death of MOISES HUERTA, III with a tire tool, that in its manner of use and intended use was capable of causing serious bodily injury or death . . . .

During trial, the court forced the State to drop the allegation of robbery because there was no evidence elicited to support the robbery charge. The jury was instructed "that a person commits the offense of murder if he intentionally or knowingly causes the death of an individual or if he, with intent to cause bodily injury to another, commits an act clearly dangerous to human life that causes the death of an individual." The verdict form signed by the foreman reads, "We, the Jury, find the Defendant, Reynaldo Cobio Cervantes, "GUILTY" of the offense of Felony Murder as charged in the indictment." Appellant's complaint focuses on the use of the term "Felony Murder" on the verdict form. Appellant did not object to the verdict form.

We review unobjected to errors in the charge to determine whether they are so egregious and created such harm to the defendant that the defendant did not receive a fair and impartial trial. Callins v. State, 780 S.w.2d 176, 190 (Tex. Crim. App. 1986) (citing Almanza, 686 S.W.2d at 171). Any harm must be reviewed in light of the entire jury charge, the state of the evidence, and any other relevant information.

18

Id. Although we agree that the verdict form was in error, we do not see any harm. There is no indication that the jury was confused. There was only one crime charged, murder by committing an act clearly dangerous to human life. The indictment charged on that basis, the evidence supported that basis, and the charge correctly instructed on that basis. Appellant cites no authority for his contention that the error in the verdict form is fundamental and also does not explain how the wording of the verdict form harmed appellant. We overrule appellant's final point of error.

The judgment is AFFIRMED.

J. BONNER DORSEY
Justice

Opinion ordered not published.
TEX. R. APP. P. 90.
Opinion delivered and filed
this the 21st day of July, 1994.

19

*EXHIBIT "E"*

THE STATE OF TEXAS                    §

COUNTY OF HIDALGO                     §

BEFORE ME, the undersigned authority, personally appeared MARGARITO MORIN who, after being by me duly sworn, deposed and said:

My name is MARGARITO MORIN.    I am a licensed private investigator with the State of Texas. My mailing address is Rt. 1, Box 293, Donna, Texas  78537. My office phone number is (210) 464-0081.

After being provided the address of Eduardo Farias, on April 8, 1997, I attempted to locate him approximately 2 miles South of Alamo Rd. in Alamo, Texas.  On that date no one was home.  On Wednesday, April 9, 1997, at approximately 11:30 p.m. with the assistance of Rey De Los Angeles contact was made with Eddie Farias.  Eddie Farias was advised by me, who I was, and that I was working for attorney Joseph Connors III out of McAllen who was representing Rey Cervantes.  On that day Eddie made a verbal statement to me that Rey Cervantes was not guilty of the offense which he had been found guilty of.  Eddie stated that he had given a statement to the Cameron County Sheriff's Department investigators about a year before the case went to Court.  Eddie stated that the Sheriff's investigator was showing him some other statements and the investigator was writing out the statement based on what he was reading from those statements.  At this point in time, Eduardo Farias was advised that Mr. Connors was the attorney representing Rey Cervantes, who had been found guilty in this

INT7:M.MORIN

particular case.  I advised Eduardo that a written statement would
need to be obtained from him at Mr. Connors' office.  At this time,
Eddie advised that he would let me know the following day April 10,
as to what time and what date he would be coming into Mr. Connors'
office.  Eddie did call me on my pager and left a number and his
name on the 10th.   Within minutes, I called the number and a
recorder came on and I left a message for Eddie to call me back.
Eddie never called back.

On Monday, April 14, 1997, at approximately 8:00 a.m. I again
called Eddie.  I again left a message on his recorder.

On April 17, 1997, I again went to his residence and did not
locate him.  On April 19, 1997 at 8:00 p.m. Mr. Connors called me
and advised me that Eduardo Farias was at his office and ready to
give a statement.  That same day at approximately 8:15 p.m. contact
was made with Eduardo Farias at 605 E. Violet, Suite 3, McAllen,
Texas.   Eddie started his statement by repeating the same
information from the Sheriff's investigators who obtained the
statement from him a year before the trial of Rey Cervantes
started.   Then he went on to state that the investigator had
mentioned to him that Rey Cervantes was driving a black and red
customized truck.  Eddie stated that the investigator had told him
that the statements said how the murder happened.  He went on to
state that according to the investigator the statements stated that
Eddie's car was at the island on the night of the beating death of
Mr. Huerta.   Also, the statements said what other people were
around him.  According to Eddie, his response to the investigator

was that he did not know anything about it, but that the investigator told him that he was there and that he could be charged with murder and get life in prison with those statements that he had. According to Eddie, he told the investigator that he did not want to go to jail. Eddie stated that the investigator told him that maybe they could use him as a witness, and if he was a witness in the case they could not send him to jail. Eddie then stated, that the investigator started reading the statements and asked him if this was the way it happened. According to Eddie, his response was "I guess, that's the way it happened." Eddie stated that there were three investigators there and only one of them was doing the talking and the others were listening. According to Eddie, throughout the whole time the investigator was writing the statement out, he would ask Eddie if that was the way it happened. Eddie stated that he responded by saying "Oh, yeah, yes." He also stated that when they were taking the statement he was really scared and nervous. They were at his house for about two or three hours. Eddie said after about a year, no one called him or came to visit him about the case, until someone showed up with a subpoena. Eddie stated that the day he went to court his cousin Jose Luis Trevino went with him to court in Brownsville. The day that Eddie testified he asked his cousin Jose Luis Trevino to go find Rey's attorney (Hector Villarreal) to tell him that the statement that he had signed was just a paper that the police wrote and he signed it because he wanted them to leave and that it was just a lie. Eddie stated that the attorney came to talk to him and he asked if he

INT7:M.MORIN                                           3

could help him out.  Eddie stated he told the attorney that he had
just signed the paper so they would leave him alone.  Eddie stated
that someone must have told the state attorney that he was talking
to Rey's attorney because after that he was asked by one of the
State's attorney what he was doing concerning Rey's attorney.
According to Eddie, he told the State attorney that he had advised
Rey's attorney that what was on the paper was a lie and the
investigator told him that he could perjure himself and could be
put in prison and be charged with murder.  Eddie stated that the
man from the State told him that he had signed the statement and
that's what he had to say.  Eddie said that the State's man asked
him if he had been threatened to change his mind.  Eddie said, "no"
it was not the truth and that he had just signed it (referring to
the statement.)  According to Eddie, the State's man told him that
he could perjure himself or be charged with the murder and get 50
to 100 years or life in the pen.  Eddie stated that he had gotten
scared and didn't say anything else.  Eddie again stated, that he
did tell the State's man that what was on the statement was a lie.
The same man asked Eddie if he had been threatened by Rey's
attorney or by any of those people because he was changing his
mind.  According to Eddie, he told the State's man "no" that he was
just scared and he had signed the statement and the investigator
had made it up.  The State's man wrote it and it was all a lie.  On
that day, according to Eddie, he was placed in a office by the
State attorneys.  Eddie stated that after the trial a state

INT7:M.MORIN                                    4

employee escorted him to his car.  He and his cousin Jose Luis
Trevino got in Eddie's car and drove home.

The following morning, someone was sent to his house and the
official took him (in the official's vehicle) to the courthouse in
Brownsville.  His cousin Jose Luis followed them in Eddie's car.
According to Eddie, the investigator (not one of the other people
he had talked to) told him he had to go with what the statement
said.  The official talked to him about the case and asked him if
he had gotten any calls or had been threatened.  Eddie stated to
the official that he had just signed the paper.  The official took
him to a different office and that was the day he testified.  Eddie
stated that when he was on the stand they asked him what his name
was and some different things.  Eddie does not remember the name of
the State's man who was asking him the questions.  According to
Eddie he was asked by the State's attorney if he knew who Rey
Cervantes was.  Eddie's response was "yes".  Eddie stated that he
said "yes" because he was answering what they wanted to hear so he
wouldn't have to go to jail.  Eddie further stated that he did not
know who Rey Cervantes was.   Eddie stated that he knew Rey
Cervantes was a TCB leader from Pharr because of the word on the
street, but he personally did not know that.  But he was answering
what the investigator wanted so he would not be charged with the
murder case.  The State's attorney asked Eddie if he had seen Rey
Cervantes in the crowd.  Eddie stated that he said on the stand to
the jury that he saw Rey Cervantes in the crowd.  According to
Eddie, he did not know who Rey Cervantes was so he couldn't have

seen him.  But the State's attorney and Eddie knew what the State's attorney wanted him to say, stick with his statement to the investigator or go to prison for murder or perjury.  According to Eddie, the State's attorney asked him if he had seen Rey Cervantes hit Huerta with a jack and Eddie said "yes".  Eddie then stated that Rey Cervantes' attorney asked him some questions.  One of which was if he had asked Jose Luis Trevino to talk to him.  According to Eddie, he does not recall which State's attorney had told him that if he (Eddie) said who Jose Luis Trevino was that he (Eddie) would be charged with the murder and that is why he told the jury that he did not know who Jose Luis Trevino was.  According to Eddie, the trial was stopped and he was told not to mention anything about guns.  Then the Court appointed an attorney for him.  According to Eddie, he talked to this attorney that was appointed to him and asked him how he was going to get the gun off his back.  According to Eddie, he told the attorney that he was going to say that he tossed the shotgun into another car and that would get the gun off of his back and he wouldn't get himself into hot water.  The attorney agreed with him and to go ahead and say that he had tossed the gun into another car.  Eddie stated that he talked to the court appointed attorney and told him that the statement he had signed for the State's investigator was not true and was full of lies and all bull.  Eddie stated that the court appointed attorney told him that he could get charged with perjury and with being an accomplice to the murder.  Eddie stated that the attorney talked to him about doing prison time.  Eddie stated that the court appointed

attorney told him to go back to the courtroom and stick with his statement in front of the jury. Rey's attorney asked Eddie if he had seen anybody hit the Huerta guy. Eddie stated that he never saw Rey Cervantes hit anyone. He also stated that he did not see Rey Cervantes kicking anybody. Eddie stated that on Saturday night he was in Pharr because Thursday night he had burned his face at the Island and Friday morning he was in McAllen. Eddie stated that he was asked by the State attorney if he remembered about whether or not the association to the gang that he (Eddie) had talked to Mr. Ponce and himself (State attorney) prior to testifying. Eddie stated he said "yes". But that the State's attorney had told him to just go with the statement. Eddie further stated that when the State's attorney found out that he had talked to Rey's attorney that they told him that he had to go with the paper because he had signed it. He was asked if he saw Rey Cervantes hit Huerta. Eddie stated he responded "yes" and that he had heard shouts from all around. Eddie stated that he knew that's what they wanted to hear. Eddie further stated that he knew there would be a lot of people at the beach and that would be the right answer. Eddie further stated that he recalled that he saw Rey Cervantes strike Huerta while he was lying on the sand on March 14, 1992. Eddie stated he answered "yes". He further stated that that was not the truth, but that is what he read off the statement. Because he was not at the beach the day that it happened. Eddie further stated that he was asked if he had ever seen the accused strike the victim with any type of jack or lug wrench or anything like that. Was that true. Eddie

INT7:M.MORIN                                          7

stated his response was "yes, sir" but he didn't know because he wasn't there and didn't see it. Eddie stated that on Thursday that same weekend he was at the beach with Missy his ex-girlfriend and Tony Keller both from McAllen. Eddie further stated that they had gone to party at the island that night and while there Eddie burned his face while putting on a display of fire eating. He stated he blew the fire into the wind and it came back onto his face. He stated that they stayed at the island because the car battery was dead. Friday morning they got a jump for their battery and they drove to Missy's house located one block west of 2nd street on Tamarack in McAllen. But she no longer lives there. That day they slept all day and according to Eddie they did not go back to the beach on Friday because he was putting aloe vera on the burns on his face. Eddie stated that on Saturday, he woke up late in the morning and went to his grandmother's house. Eddie stated he called his mother and told her that the car was missing. According to Eddie, his mother took the car somewhere to put a new battery in the car. That night he was at the house because she had taken the car. Eddie further stated that Saturday he was trying to get on his mother's good side because he had taken the car without permission. Eddie further stated that he stayed at his mom's house Saturday and didn't go to the beach. Sunday morning, he found the keys and took off to the beach again without permission. Eddie stated that on Sunday he picked up a couple of guys in Lopezville. While in route to the island as they got to Port Isabel they saw some friends of theirs who had had an accident, they were in a grey

Mazda that belonged to Rey Cervantes.   Eddie stated that they (Eddie's friends in Mazda) were fighting with the other party that they hit so they stopped and picked up their friends and went to the beach.   According to Eddie, Mando Gamez, Rolando Cruz (Party) and Angie Balderas went to the island.   According to Eddie, they were talking about what had happened at the beach.   Eddie stated that he does not remember Mando Gamez stating anything about being at the beach on Saturday.   According to Eddie, they knew about what had happened.   But he didn't.   Eddie stated, that the people who had the accident knew what had gone on and he never found out until Sunday what had happened at the beach.

He made the above admissions against his own Penal interests to me.

_____
Affiant

Sworn to and subscribed by <u>MARGARITO MORIN</u> before me the undersigned authority, today, April 23, 1997.

LISA MICHELLE GOMEZ
MY COMMISSION EXPIRES
November 17, 1999

_____
Notary Public In and For
The State of Texas

EXHIBIT "F"

1   Q.   Okay.   The red pickup.   The Defendant Cervantes' pickup,
2        correct?
3   A.   Yes, sir.
4   Q.   I asked you if anything happened, and you said that
5        after awhile, the red Camaro drove by?
6   A.   (nods head in the affirmative).
7   Q.   Correct?
8   A.   Yes, sir.
9   Q.   Now, let's go back to this.  Did this pickup stay right
10       in front of his car, or did this pickup go on and park
11       some other place close from where you were at?
12  A.   It wasn't right in front.  It was like to a side.
13  Q.   Like to a side.  So, this pickup moved over?  Is that
14       correct?
15  A.   (nods head in the affirmative).
16  Q.   Now you need to speak with words because he needs to
17       take it, and they need to hear it.
18  A.   Right.
19  Q.   Okay.  Now, after that pickup moved over and parked, how
20       much time went by?  Do you recall?
21  A.   No, sir.
22  Q.   Okay.  Was it a long time, like an hour or two, or was
23       it a short period of time, 15 or 20 minutes?
24  A.   Short period of time.
25  Q.   Now, what did you see, then?

270

```
 1   A.   All of a sudden, it just happened, that everybody just

 2        ran toward the car.

 3   Q.   Okay.  There is a car.  Where did you see that car?

 4        Where was the car?  Where did you see the car?

 5   A.   It was going that way.

 6   Q.   It was going north, like so?

 7   A.   Yes, sir.

 8   Q.   What kind of car was it?

 9   A.   A red Camaro.

10   Q.   I'm going to put your car here.  It was a red Camaro?

11         Did you see how many people were in the red Camaro?

12   A.   I think it was like -- like three, that I saw.

13   Q.   Three that you saw?  Did you see whether or not the

14        Camaro was stopped?

15   A.   It stopped -- because it started yelling.

16   Q.   The Camaro stopped because they started yelling.  Who

17        was yelling?

18   A.   First, they were yelling.  And then, our group yelled

19        back.  So he stopped, got off the car, and they went at

20        it.

21   Q.   Who went at it?

22   A.   The group that I was with.

23   Q.   The group that you were with?

24   A.   Yes, sir.

25   Q.   The Tri-City Bombers?
```

271

1    A.   Yes, sir.

2    Q.   And who were the members of that group that went at

3         them?

4    A.   The names?

5    Q.   Yes.

6    A.   I don't know all of them by name.

7    Q.   Okay.  How many do you know by name?

8    A.   Oh, three -- four.

9    Q.   Okay.  Tell us those names?

10   A.   Oh, Mando was there, Shamu, and Balde.

11             MR. VILLARREAL:  I'm sorry.  I didn't get that

12        last name.

13             THE WITNESS:  Shamu -- Campos.

14   Q.   Mando, Shamu, and Balde?

15   A.   Yes, sir.

16   Q.   And what happened?

17   A.   Well, they went at them, and I remember seeing them like

18        they were beating him up.

19   Q.   I'm sorry.

20   A.   Beating him up, and then a car alarm rang, and they ran

21        back to my car, and then other people just stayed there.

22        We were just watching them, that they were kicking the

23        other two.

24   Q.   So you're telling us that this car, the red Camaro that

25        drove by, and the people inside, were screaming?

272

1    A.   Well, when they were -- as they were driving by.

2    Q.   As they were driving by?

3    A.   (nods head in the affirmative).

4    Q.   And that your friend, Mando, and, Shamu, and Balde, ran

5         at it?

6    A.   Well, not only them.  It was a group that ran.

7    Q.   The group ran at them?

8    A.   Yes, sir.  They all stepped out of the car, so they went

9         towards him.  They saw him step out of the car, so they

10        saw him toward him.

11   Q.   And did a fight begin?

12   A.   First, it was an argument, and an argument turned into a

13        fight.

14   Q.   Okay.  And what happened with your friends Gamez, Shamu

15        and Balde?

16   A.   Well, they were kicking him, and when the car alarm

17        sounded, they ran back to my car and we were just

18        watching the scene.

19   Q.   So what happened after that?  What did you see when you

20        were backed there at your car, that was happening at the

21        red Camaro?

22   A.   I could see people was kicking at some guy on the floor,

23        and one ran off, and I heard some windows breaking.

24   Q.   You heard windows breaking?

25   A.   Yes, sir.

273

1    Q.   Did you see any person, in particular, striking the

2         person on the sand that had gotten off of the red

3         Camaro?

4    A.   Oh, I saw a couple of them.

5    Q.   Okay.  Who were they, by names?

6    A.   I don't know them by names.

7    Q.   Do you know them by faces?

8    A.   I couldn't tell you.

9    Q.   Did you see the people that had been in the red Chevy

10        pickup, that had parked right in front of you, and to

11        the side of you, approach and participate in the beating

12        of the victim of the red Camaro?

13    A.   Yes, sir.

14    Q.   Before the red Camaro drove by, did you hear any of the

15        occupants of the red Chevy pickup say anything about

16        what had happened earlier?

17    A.   Yes.  I heard.  I heard that they were talking about it.

18    Q.   Okay.  Did you hear Rey Cervantes say anything?

19    A.   No, sir.

20    Q.   The people that you saw surround the red Camaro, do you

21        know whether or not they belonged to a certain group?

22    A.   I didn't understand the question.

23    Q.   The people that you saw --

24               MR. GARZA:  May I approach the witness, Your

25        Honor?

1          THE COURT:  You may.

2  Q.   (BY MR. GARZA) The people that you saw come around the

3       red Camaro, this is the red Camaro over here.  Okay.

4       And you say that you were parked over here, and on the

5       beach, and the truck was driving south, stopped in front

6       of you, and there was some talk and some commotions --

7       some things were said -- and then the truck moved and

8       parked to the side.  Okay.  Some minutes later, you said

9       that the truck drove by and there was some screaming

10      back and forth, and the car stopped.

11          MR. VILLARREAL:  I'm going to object to the

12      form of the question.  He is testifying, and he is

13      leading the witness.

14          THE COURT:  All right.  He is just repeating

15      the question.  Go ahead and proceed.  I will allow the

16      question.  Overruled.

17  Q.   (BY MR. GARZA) And there were a lot of people that came

18      around the car.  Isn't that correct?

19  A.   When?

20  Q.   Do you remember that?

21  A.   Yes.

22  Q.   The people that came to the car, that surrounded the

23      car, do you know whether they belonged to a certain

24      group?

25  A.   TCB.

```
 1   Q.   I'm sorry?

 2   A.   TCB.

 3   Q.   Tri-City Bombers?

 4   A.   Yes, sir.

 5   Q.   Did you recognize them as being members of the Tri-City

 6        Bombers?

 7   A.   Yes, sir.

 8   Q.   All right.  How long have you been with the

 9        Tri-City Bombers yourself?

10   A.   A year.

11   Q.   A year?  Do you know their colors?

12   A.   Yes, sir.

13   Q.   What are their colors?

14   A.   Red and black.

15   Q.   Do you know Reynaldo Cervantes' truck?

16   A.   Yes, sir.

17   Q.   What colors are on Rey Cervantes' truck?

18   A.   Red and black.

19   Q.   Does it have any other decorations, or any other

20        customizing?

21   A.   It has got a fin in the back, and it has got a rag top.

22   Q.   A fin in the back, and a rag top.  Kind of like a velvet

23        top?

24   A.   Yes, sir.

25   Q.   What color is at the top?
```

276

1   A.   Black.

2   Q.   Black?    If you see a photograph of that, do you feel

3        that you could recognize it?

4   A.   Yes, sir.  Of that truck?

5   Q.   Yes, sir?

6   A.   Yes, sir.

7   Q.   I'm showing you State's Exhibit Number 18.  Do you

8        recognize the pickup?

9   A.   Yes, sir.

10  Q.   Whose pickup is that?

11  A.   Rey's.

12  Q.   Rey who?

13  A.   The defendant.

14  Q.   The defendant in the purple sweater over there?

15  A.   Yes, sir.

16  Q.   Now, did you get a good look at the red Camaro?

17  A.   Well, not really.  It was kind of dark and I was a

18       little messed up.

19  Q.   I'm going to show you State's Exhibit Number 12.  Have

20       you seen that picture before?

21  A.   It looks familiar.

22  Q.   I'm sorry?

23  A.   It looks familiar.

24  Q.   Does it look familiar like the car that you saw on March

25       the 14th of 1992?

277

```
 1   A.   Yes, sir.

 2   Q.   Does this car seem familiar as the car, from where the

 3        occupant got off of, and you saw being beaten on the

 4        sand on March 14, 1992?

 5   A.   It looks almost the same.

 6   Q.   The same car, or the car looks familiar, as the car that

 7        you saw the Tri-City Bombers encircle, to beat the

 8        occupant?

 9   A.   Yes, sir.

10   Q.   Did you get a close look at the driver of the red

11        Camaro?

12   A.   No, sir.

13   Q.   Did you get a look at him?

14   A.   No, sir.

15   A.   It was already dark.

16   Q.   Do you recognize State's Exhibit Number 11?

17   A.   No, sir.

18   Q.   What about State's Exhibit Number 7?

19   A.   No, sir.

20   Q.   Do you recognize that young man?

21   A.   No, sir.

22   Q.   Can you tell the Ladies and Gentlemen of the jury, more

23        or less, how many times this individual was beaten?

24   A.   What do you mean, sir, beaten?

25   Q.   Was it one punch, was it one kick, or what?
```

CM/PDF - www.texta.com

1    A.    It was several.

2    Q.    I'm sorry?

3    A.    It was several.  It was for awhile, they were beating on

4          him.

5    Q.    I didn't understand you, Eddie.

6    A.    There was several people hitting on him.  It lasted for

7          awhile, so it wasn't just one.

8    Q.    So there was more than one person beating on him?

9    A.    Yes, sir.

10   Q.    And it lasted for awhile?

11   A.    Yes, sir.

12   Q.    More or less, how long?

13   A.    At least five minutes.

14   Q.    Five minutes?  Did you ever see that young man fight

15         back?

16   A.    He threw the first punch.

17   Q.    He threw the first punch?

18   A.    Yeah.

19   Q.    Did you see who he hit?

20   A.    No, sir.  It was already dark, like they just rushed at

21         him.

22   Q.    When he threw the first punch, was it on a one to one,

23         he against the other person, or was he already

24         encircled?

25   A.    No.  First it was one on one.

279

1   Q.   First it was one to one?

2   A.   Yes.

3   Q.   And when the car first stopped, do you recall if the car

4        was first approached by one or two individuals, or by

5        the whole group?

6   A.   It was, I think it was two, that first walked up to it,

7        and he got off.

8   Q.   Okay.  So two people walked up to it?

9   A.   Yes.

10  Q.   Do you know if these two that approached the red Camaro

11       that belonged to Moises Huerta, III, were TCB?

12  A.   To my knowledge, they were, because they were all out

13       there.

14  Q.   They were all there.  Rey Cervantes was out there?

15  A.   I don't recall him being there.

16  Q.   But, he was at the beach?

17  A.   Yes, sir.

18  Q.   And was the truck parked nearby, near where the location

19       of this red Camaro?

20  A.   Yes, sir.

21  Q.   And you told us earlier that he was the leader of the

22       Pharr group?

23  A.   Yes, sir.

24  Q.   Now, when you were at the beach, Eddie, you were with

25       the Lopezville group, with Mando Gamez.  And that group,

280

1    Rey Cervantes was with at the beach, also, the Pharr

2    group, were you all together, or were you all separate?

3  A.  In the beginning, we were just -- we were just Lopez,

4    the Lopez group.

5  Q.  Okay.  And then at the end, when the car drove by?

6  A.  Well, when the car drove by, we were there talking to

7    the Pharr group, and they were talking to the Lopez --

8    they drove by -- I don't know what they said, but Gamez

9    started talking, and that's when the red Camaro passed.

10  Q.  And when the young man was beaten to death, the person

11    that you see converge around his car, the people that

12    you see around him, that are beating him for quite

13    awhile, were they members of the Pharr group, as best as

14    you know, or the Lopezville group?

15  A.  It was both, at the end, I remember that.  At one time

16    Lopez went back, and took off.

17  Q.  And did what, sir?

18  A.  And we left.

19  Q.  I'm sorry?

20  A.  We left the area, and we went to Jetties.

21  Q.  So when the fight first started, you were in there, and

22    then you walked out.  You ventured backed to your car.

23  A.  Yes, sir.

24  Q.  And did you see this young man get hit with a tire tool

25    -- with a large object like a jack?

281

1   A.   Yes, sir.

2   Q.   You saw that?

3   A.   Yes, sir.

4   Q.   Did you see how many times he was hit?

5   A.   Well, I heard it twice.

6   Q.   You heard it, also?

7   A.   Yes, sir.

8   Q.   And did you see where Moises Huerta was hit with the

9        tire tool?

10  A.   No, sir.

11  Q.   Did you see who hit him with the tire tool?

12  A.   Oh, I wouldn't be able to identify it because it was

13       real dark, but I saw --  I saw him personally -- I saw

14       him get hit over the head with an object.

15  Q.   Do you recall, and did you see where that tire tool or

16       tire jack came from?

17  A.   From a truck.

18  Q.   Okay.  What kind of truck was that?

19  A.   It was a blue -- light blue Chevy.

20  Q.   Okay.  And do you know who drives that light blue, late

21       model Chevy?

22  A.   No, sir.

23  Q.   Is that person a TCB, also?

24  A.   As I heard, he wasn't.

25  Q.   I don't want you to tell me what you've heard.  I want

282

1    you to tell me what you know.

2  A.  No.

3  Q.  Okay.  Did you see the Defendant Reynaldo Cervantes

4    around this man at the time that he was being beaten?

5  A.  As it got dark, I didn't see him there.

6  Q.  And before it got dark, did you see him?

7  A.  Yes, sir.

8  Q.  Did you see members of the Pharr Tri-City Bombers group

9    surround and beat this young man to death?

10  A.  Yes.

11  Q.  I'm sorry?

12  A.  Yes.

13  Q.  Do you know if your friend, Mando Gamez, struck

14    Moises Huerta, III, on the head and the face with a jack

15    or a tire tool and caused his death, on March the 14th

16    of 1 92?

17  A.  No, sir.

18  Q.  Do you know that, or you don't know that?

19  A.  No.  I do know that.

20  Q.  Was it him?

21  A.  No, sir.

22  Q.  At the time that Moises Huerta is being beaten by the

23    Tri-City Bombers, do you know where Shamu is at?

24  A.  Can you repeat the question?

25  Q.  Let me back off.  When Moises Huerta is being beaten,

283

CSAPDF - www.texisa.com

1        and kicked, and you hear the object strike him, with the

2        tire tool, the tire jack, where was Moises Huerta, and

3        what was his position?

4    A.  He was on the floor.

5    Q.  He was on the sand?

6    A.  Yes.

7    Q.  On the ground?

8    A.  Yes.

9    Q.  And was he fighting back?

10   A.  At the time that they hit him with the jack?

11   Q.  Yes.

12   A.  No, sir.  He was already on the floor.

13   Q.  He was already knocked out?

14   A.  Yes, sir.

15   Q.  Do you know, if anything was taken from his person?  Did

16       you see if anything was taken from his person?

17   A.  No, sir.  When he was knocked out, our group backed out,

18       and we took off, so --

19   Q.  Do you know, Eddie, whether or not any weapons were

20       being used by the Tri-City Bombers, either your group,

21       or the Pharr group?

22   A.  I remember seeing a 12 gauge in a car.

23   Q.  A 12 gauge in whose car?

24   A.  In mine.

25   Q.  Any handguns?

                                                            284

CAUSE NO. 92-CR-633-B

| | |
|---|---|
| THE STATE OF TEXAS | *   IN THE DISTRICT COURT OF |
| VS. | *   CAMERON COUNTY, TEXAS |
| REYNALDO CERVANTES | *   138TH JUDICIAL DISTRICT |

**MOTION TO REQUIRE THE STATE TO REVEAL ANY AGREEMENT
ENTERED INTO BETWEEN THE STATE AND ANY PROSECUTION WITNESS
THAT COULD CONCEIVABLY INFLUENCE THEIR TESTIMONY**

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES REYNALDO CERVANTES, the Defendant, and moves the Court to issue an order requiring the State to reveal any agreement entered into between the District Attorney or any other law enforcement agency and any prosecution witness that could conceivably influence said witness' testimony on the following grounds:

I

That the credibility of said witness will be an important issue in the principal case, and the evidence of any understanding or agreement as to future prosecution would be relevant to such witness's credibility, and the trial jury is entitled to know of it.

II

That refusal to reveal any such agreement constitutes a violation of the due process clause of the Fourth and Fourteenth Amendment of the United States Constitution.

EXHIBIT "G"

12

WHEREFORE, PREMISES CONSIDERED, Defendant moves the court to grant this motion in all things.

Respectfully submitted,

Law Offices of
HECTOR J. VILLARREAL
400 E. Cano
Edinburg, Texas 78539
(512) 383-8131
Fax (512) 383-6603


HECTOR J. VILLARREAL
State Bar No. 20582700
Federal I.D. No. 3901

Attorney for Defendant

CR. NO. 92-CR-633-H;
CERVANTES,REYNALDO;
MOTION TO REQUIRE THE
STATE TO REVEAL ANY
EVIDENCE ENTERED INTO
EVIDENCE THE STATE AND ANY
OTHER WITNESS WHICH MAY
COULD CONSTITUTE INFLUENCE
THEIR TESTIMONY

- 2 -

**13**

## CERTIFICATE OF SERVICE

I, Hector J. Villarreal, on this _17th_ day of _September_, 1992, as attorney of record for Defendant, Reynaldo Cervantes, do hereby certify that a true and correct copy of the above and foregoing Motion to Require the State to Reveal any Agreement Entered Into Between The State and any Prosecution Witness That Could Conceivably Influence Their Testimony was this date mailed, certified mail, return receipt requested, to the the following attorneys of record:

CM/RRR: P 554 618 119
Assistant District Attorney,
Hon. Gustavo Garza
974 E. Harrison
Brownsville, Texas, 78520
(Counsel for the State)

CM/RRR: P 554 618 120
Hon. Manuel Trigo
1601 Chicago Ave.
McAllen, Texas 78501
(Attorney for Rolando Cruz)

CM/RRR: P 554 618 121
Hon. Antonio Garcia
414 S. Cage
Pharr, Texas 78577
(Attorney for Claudia Garcia)

CM/RRR: P 554 618 122
Hon. Bobby Flores
4106 N. 23rd
McAllen, Texas 78504
(Co-Counsel for Reynaldo Cervantes)

CM/RRR: P 554 618 123
Hon. Matias Morin
400 E. University
Edinburg, Texas 78539
(Attorney for Angie Balderas)

CR. NO. 92-CR-433-A;
CERVANTES,REYNALDO;
MOTION TO REQUIRE THE
STATE TO REVEAL ANY
AGREEMENT ENTERED INTO
BETWEEN THE STATE AND ANY
PROSECUTION WITNESS THAT
COULD CONCEIVABLY INFLUENCE
THEIR TESTIMONY

- 3 -

CM/RRR: P 554 618 124
Hon. Alfredo Padilla
3505 Boca Chica Blvd.
Brownsville, Texas  78520
(Attorney for Jose Morin)

CM/RRR: P 554 618 125
Hon. Richard S. Hoffman
1718 Boca Chica Blvd.
Brownsville, Texas  78520
(Attorney for Manuel Garcia)

CM/RRR: P 554 618 126
Hon. Gary Ortega
812 W. Price Rd.
Brownsville, Texas  78520
(Attorney for Gerardo Gutierrez)

SIGNED this _17th_ day of _September_, 1992.

HECTOR J. VILLARREAL

CR. NO. 93-CR-433-B/
CERVANTES,REYNALDO,
MOTION TO REQUIRE THE
STATE TO REVEAL ANY
INHERENT INTENT INTO
BEFORE THE STATE USE ANY
PROSPECTIVE INITIAL THAT
COULD CONCEIVABLY EVIDENCE
THEIR TESTIMONY

- 4 -

1!

## CAUSE NO. 92-CR-633-B

THE STATE OF TEXAS       *     IN THE DISTRICT COURT OF

VS.                         *     CAMERON COUNTY, TEXAS

REYNALDO CERVANTES     *     138TH JUDICIAL DISTRICT

### ORDER

On motion of the Defendant to require the State to reveal any agreement entered into between the State and any prosecution witness that could conceivably influence their testimony, it is ORDERED that the said motion be and same is hereby GRANTED/~~DENIED~~.

SIGNED this 16 day of _____, 1992.

Copies to: OCT 2 0 1992
Hon. Hector Villarreal
DA's Office
Sheriff's Office



JUDGE PRESIDING



CR. NO. 92-CR-633-B/
CERVANTES,REYNALDO,
MOTION TO REQUIRE THE
STATE TO REVEAL ANY
AGREEMENT ENTERED INTO
BETWEEN THE STATE AND ANY
PROSECUTION WITNESS THAT
COULD CONCEIVABLY INFLUENCE
THEIR TESTIMONY

- 8 -

16